Michael G. **GILMAN**, Plaintiff–Appellant,

v.

**BHC SECURITIES, INC.,**
Defendant–Appellee.

**No. 1616, Docket 95–9290.**

United States Court of Appeals,
Second Circuit.

Argued June 6, 1996.

Decided Jan. 17, 1997.

---

Richard M. Meyer, Milberg Weiss Bershad Hynes & Lerach, L.L.P., New York City, for Plaintiff–Appellant.

Jack C. Auspitz, New York City (Charles L. Kerr, David S. Berg, Morrison & Foerster, L.L.P., of counsel), for Defendant–Appellee.

Before: NEWMAN, Chief Judge, JACOBS, Circuit Judge, and CHATIGNY, District Judge.[1]

JACOBS, Circuit Judge:

This putative class action for breach of contract and breach of fiduciary duty in the sale of securities was commenced by plaintiff Michael G. Gilman in New York State Supreme Court (New York County) and was removed, on the basis of diversity jurisdiction, to the United States District Court for the Southern District of New York by defendant BHC Securities, Inc. ("BHC"). BHC moved in federal court to dismiss the action on the grounds that (1) Gilman's claims were preempted by federal law; and (2) there was no contractual or fiduciary relationship between BHC and Gilman. The district court dismissed the complaint on the preemption ground. On appeal, Gilman disputes that his claims were preempted, but also argues that the district court lacked subject matter jurisdiction. We agree that the district court was without jurisdiction, and therefore we vacate the judgment and remand with instructions to remand the case to state court. We do not reach the issue of whether the claims in this case are preempted by federal law.

## BACKGROUND

Gilman commenced this action on January 21, 1994, alleging various state law claims on

---

1. Hon. Robert N. Chatigny, United States District Court Judge for the District of Connecticut, sitting by designation.

behalf of a putative class of all persons for whom BHC had executed securities transactions in which BHC received "order flow payments." As the district court explained, "[p]ayment for order flow is the practice in the securities industry of brokers receiving payments from market makers or exchange specialists for having directed a volume of transactions to such market makers or exchange specialists for execution of the orders placed by investors." *Gilman v. BHC Securities, Inc.*, No. 94–CV–1133 (AGS), 1995 WL 747738, at *2 (S.D.N.Y. Dec. 18, 1995). Order flow payments are thus a type of volume discount—in either cash or in-kind services—by which market makers (who actually execute securities transactions) reward brokers for having directed business to them. SEC regulations require brokers to disclose the nature of any order flow payments received in respect of their customers' orders (when the orders involve a type of security on which such payments are received), and also require additional disclosures (upon request) regarding order flow payments received on a customer's specific transactions. *Id.* at *3; *see* Payment for Order Flow, SEC Release No. 34–34902, 59 Fed.Reg. 55,006, 55,010 (Nov. 2, 1994); 17 C.F.R. § 240.10b–10(a)(7)(iii).

The complaint alleges that order flow payments are tantamount to kickbacks, and that BHC's failure to disclose its receipt of such payments violated various New York statutes, "breached the fiduciary relationship between principal and agent, [and] violated the express and implied terms of the contracts between BHC and its customers." Gilman pled no federal claims. Although the complaint recites that the suit "is brought as a class action" on behalf of "several thousand" clients of BHC, there was apparently no ruling on class certification in the state court (and likewise none in the district court). It

is undisputed that Gilman's individual stake in this lawsuit—as well as that of every other member of the putative class—is trivial, only a few cents per share traded. The complaint seeks: (a) compensatory damages both for "the amount of kickbacks and other inducements received [by BHC] from market makers for the execution of customer orders," and for "the amounts of commissions received by BHC" from Gilman and the other class members for handling their securities transactions; (b) an unspecified amount of "punitive damages for commercial bribe receiving and fraudulent conduct"; (c) litigation costs; and (d) an injunction against BHC's further acceptance of order flow payments.

On February 18, 1994, BHC removed Gilman's action to federal district court pursuant to 28 U.S.C. §§ 1441(a) and 1446. The petition averred that the district court had jurisdiction under 28 U.S.C. § 1332 because there was complete diversity of citizenship and because the amount in controversy exceeded $50,000. In support of its claim that the jurisdictional amount was satisfied, BHC stated, first, that "the relief sought is in the nature of a common fund for the benefit of the putative class members and in which each putative class member has a common and undivided interest," and that the value of any such fund would exceed $50,000. Second, the petition predicted that Gilman would seek more than $50,000 in punitive damages, which would create another "common fund" in which "[e]ach putative class plaintiff would have a common and undivided interest." [2]

Gilman moved to remand the case to the New York State Supreme Court on April 18, 1994, arguing that each class member's claim was "independent and individual," and that no one could say "to a legal certainty" that each class member who transacted with BHC

---

**2.** The petition also references Gilman's claim for an injunction against BHC's collection of order flow payments, and asserts that, "where injunctive relief is sought, the amount in controversy may be measured by the value of the object of the litigation or the stake to the defendant, which is in excess of $50,000." We do not address this claim because BHC has apparently abandoned it on appeal and has made no showing as to what the cost of complying with such an injunction would be. In any event, the soundness of such a

jurisdictional premise is not obvious. *See, e.g., Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1050 (3d Cir.1993) ("In a diversity-based class action seeking primarily money damages, allowing the amount in controversy to be measured by the defendant's cost would eviscerate *Snyder [v. Harris]*'s holding that the claims of class members may not be aggregated in order to meet the jurisdictional threshold."); *Blair v. Source One Mortgage Servs. Corp.*, 925 F.Supp. 617, 622–23 (D.Minn.1996) (collecting cases).

"could receive a punitive damage award of $50,000." But Gilman withdrew the motion before it was decided, and the district court did not thereafter consider the issues of subject-matter jurisdiction that Gilman had raised.

On November 16, 1994, BHC moved to dismiss the complaint on the grounds that Gilman's claims were preempted by federal law and that BHC had no contractual or fiduciary relationship with Gilman. *Gilman,* 1995 WL 747738, at *1. In an Opinion and Order issued on December 18, 1995, the district court granted the motion on the preemption ground and declined to address the second ground. *Id.* at *5–*6.

## DISCUSSION

Although Gilman abandoned his remand motion challenging the district court's jurisdiction, we are of course bound to consider his jurisdictional challenge now because "any party[,] ... at any stage of the proceedings, may raise the question of whether the court has subject matter jurisdiction." *United Food & Commercial Workers Union, Local 919 v. Centermark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994) (quoting *Manway Constr. Co. v. Housing Auth. of Hartford,* 711 F.2d 501, 503 (2d Cir.1983)) (internal quotations omitted).

The party asserting federal jurisdiction bears the burden of proving that the case is properly in federal court. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *United Food,* 30 F.3d at 304–05. BHC must shoulder that burden here, because BHC removed this case to the district court on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(1). Diverse citizenship is uncontested (Gilman being a citizen of Maryland, and BHC a citizen of Delaware and Pennsylvania).[3] The sole jurisdictional question is whether Gilman's complaint alleges more than $50,000 in controversy.[4] "To that end,

it bears repeating that [the] party invoking [federal] jurisdiction ... has the burden of proving that it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount." *United Food,* 30 F.3d at 304–05 (quoting *Tongkook America, Inc. v. Shipton Sportswear Co.,* 14 F.3d 781, 784 (2d Cir.1994)) (internal quotations omitted). BHC must "justify [its] allegations" that Gilman's complaint asserts claims exceeding $50,000 "by a preponderance of evidence." *McNutt,* 298 U.S. at 189, 56 S.Ct. at 785.

For reasons expressed below, we hold that BHC has not met its burden of proof and that the district court therefore lacked subject matter jurisdiction. Accordingly, we vacate the dismissal of Gilman's complaint and remand to the district court with instructions to remand the case to state court. *See Caterpillar Inc. v. Lewis,* —— U.S. ——, ——, 117 S.Ct. 467, 477, 136 L.Ed.2d 437 (1996) ("if, at the end of the day and case, a jurisdictional defect remains uncured, the judgment must be vacated"); *United Food,* 30 F.3d at 301.

Resolving this jurisdictional question entails consideration in some detail of the governing legal standards for Gilman's claims, as well as their factual predicate. BHC does not contend that Gilman or any member of the class he purports to represent has an individual claim exceeding $50,000. BHC never disputes Gilman's assertion that the "individual stake" of each class member "is relatively small," totaling only "one [or] two cents per share" of stock traded through BHC, and points to no class member whose trading volume would support a claim exceeding $50,000. Instead, BHC argues that the class members—each of whom may have suffered only a trivial loss—"assert a common and undivided interest," and that such claims, under "long established principles of diversity jurisdiction," may be aggregated to satisfy the jurisdictional amount in controversy.

---

3. In a class action, there is diversity of citizenship if each named plaintiff is of diverse citizenship as to each defendant. *See Snyder v. Harris,* 394 U.S. 332, 340, 89 S.Ct. 1053, 1058–59, 22 L.Ed.2d 319 (1969).

4. The recently enacted increase of the jurisdictional amount to $75,000 applies only to cases filed on or after January 17, 1997. *See* Federal Courts Improvement Act of 1996, § 205, Pub.L. No. 104–317, 110 Stat. 3847, 3850 (1996).

It is true that claims may be aggregated to reach the jurisdictional minimum "when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest." *Zahn v. International Paper Co.*, 414 U.S. 291, 294, 94 S.Ct. 505, 508, 38 L.Ed.2d 511 (1973). But that rule is inapplicable here, because the class members' claims are "separate and distinct" and therefore cannot be aggregated, and because aggregation is not justified by the manner in which order flow payments originate or by the demand for punitive damages.

### A. The "Non–Aggregation" Rule and the "Common Fund" Exception.

In *Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), the Supreme Court considered whether, in light of the 1966 amendments to Rule 23 of the Federal Rules of Civil Procedure, the separate and distinct claims of class action plaintiffs could be aggregated to satisfy the amount in controversy for federal jurisdiction. The Court held that such aggregation was impermissible, 394 U.S. at 335–36, 89 S.Ct. at 1056–57, thereby reaffirming "the well-established rule that each of several plaintiffs asserting separate and distinct claims must satisfy the jurisdictional-amount requirement if his claim is to survive a motion to dismiss." *Zahn*, 414 U.S. at 300, 94 S.Ct. at 511. This rule against aggregating separate and distinct claims "plainly mandates ... that the entire case must be dismissed where none of the plaintiffs claims more than [the jurisdictional minimum.]" *Id.*

Federal courts have applied the "non-aggregation" rule consistently in a variety of contexts. *See, e.g., Asociacion Nacional de Pescadores a Pequena Escala o Artesanales de Colombia (ANPAC) v. Dow Quimica de Colombia, S.A.*, 988 F.2d 559, 563 (5th Cir. 1993) (claims by fishermen for lost income and personal injuries arising from chemical spill were "individual" and not aggregable for jurisdictional purposes because "one plaintiff's recovery is neither dependent upon, nor necessarily reduced by, another's"); *Griffith v. Sealtite Corp.*, 903 F.2d 495, 498 (7th Cir. 1990) (workers' claims for wages due under a single employment contract "were separate and distinct" and could not be "aggregate[d] ... to satisfy the jurisdictional amount"); *Sellers v. O'Connell*, 701 F.2d 575, 579 (6th Cir.1983) (class claims for pension benefits held in union trust fund could not be aggregated because "each plaintiff s[ought] to receive a fixed sum under the terms of the trust instrument," and thus "the class plaintiffs d[id] not possess a common and undivided interest in the relief sought"); *United States v. Southern Pac. Transp. Co.*, 543 F.2d 676, 683 (9th Cir.1976) (trespass claims against railroad by class of land allottees could not be aggregated for purposes of satisfying the jurisdictional amount because the allottees' "rights to exclude trespassers [were] not held in any group status" but arose instead "only from the status of each [allottee] as [an] individual") (internal quotations omitted); *Lonnquist v. J.C. Penney Co.*, 421 F.2d 597, 599–600 (10th Cir.1970) (claims that department stores owed class plaintiffs refunds for allegedly usurious interest charges were "separate and distinct").

An equally well-established principle is that "when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount." *Troy Bank of Troy, Indiana v. G.A. Whitehead & Co.*, 222 U.S. 39, 40–41, 32 S.Ct. 9, 9, 56 L.Ed. 81 (1911). This "common fund" exception to the rule against aggregating claims dates back at least to *Shields v. Thomas*, 58 U.S. (17 How.) 3, 4–5, 15 L.Ed. 93 (1854), in which the Court held that joint claims filed against the administrator of an estate by the estate's distributees satisfied the "sum in controversy" when the claims were considered "collectively." The *Shields* Court reasoned that the distributees "all claimed under one and the same title" to the estate proceeds, and "had a common and undivided interest in the claim." *Id.* at 5. The Court specifically distinguished *Oliver v. Alexander*, 31 U.S. (6 Pet.) 143, 8 L.Ed. 349 (1832), in which seamen's joint claims for wages were held not to be aggregable, on the ground that each seaman in that case did not "recover a portion of a common fund to be distributed among the claimants, but the amount due to himself on his own separate contract." 58 U.S. at 5. *Shields*

emphasized that "it was perfectly immaterial to the [defendant], how [the proceeds] w[ere] to be shared among [the claimants].... [I]f there was any difficulty as to the proportions in which they were to share, the dispute was among themselves, and not with [the defendant]." *Id.*

Courts apply the common fund doctrine, and permit aggregation of claims to satisfy the jurisdictional amount, "only when several parties have a common, undivided interest and a single title or right is involved." 14A Charles A. Wright *et al.*, Federal Practice and Procedure § 3704, at 83 (2d ed. 1985). For example, aggregation of claims has been allowed in the following instances: the distributees' action in *Shields;* a wrongful death action asserted under a statute "creat[ing] a single liability on the part of the defendant" and permitting "but one action for the sole and exclusive benefit" of all surviving beneficiaries, *see Texas & P. Ry. Co. v. Gentry,* 163 U.S. 353, 360–61, 16 S.Ct. 1104, 1106–07, 41 L.Ed. 186 (1896); an action by the assignees of two promissory notes to enforce their "common and undivided interest" in a vendors' lien that served as the "common security for the payment of both notes," *see Troy Bank,* 222 U.S. at 41, 32 S.Ct. at 9; an action by members of an Indian tribe to quiet title to what was "essentially a single tract of land ... adjoining [their] Reservation" but which was held by several individual defendants, *see Skokomish Indian Tribe v. France,* 269 F.2d 555, 558–59 (9th Cir.1959); an action on a fire insurance policy, filed jointly by a debtor and the nine creditors to whom he had partially assigned his claims to the insurance proceeds, *see Phoenix Ins. Co. v. Woosley,* 287 F.2d 531, 533 (10th Cir.1961); an action by several members of the same family to secure family social services in which they shared a "common and undivided" interest, *see Black v. Beame,* 550 F.2d 815, 818 (2d Cir.1977); and an action against a majority shareholder for breach of fiduciary duty, brought by minority shareholders who held a "common and undivided interest" in the corporation's assets, *see Eagle v. American Telephone & Telegraph Co.,* 769 F.2d 541, 546–47 (9th Cir.1985). *See also* 14A Wright *et al.,* § 3704, at 83–85 (collecting cases).

As one court expressed the principle, the "paradigm cases" allowing aggregation of claims "are those which involve a single indivisible res, such as an estate, a piece of property (the classic example), or an insurance policy. These are matters that cannot be adjudicated without implicating the rights of everyone involved with the res." *Bishop v. General Motors Corp.,* 925 F.Supp. 294, 298 (D.N.J.1996). As explained in the next section of this opinion, Gilman's claims regarding the impropriety and misuse of order flow payments *do not* implicate a "single indivisible res," and *could be* adjudicated on an individual basis, because the putative class members have no "common and undivided interest" in those payments. The common fund exception therefore is inapplicable in this case.

**B.** *The Compensatory Damages Claim.*

BHC includes in its briefs a lucid account of how order flow payments originate and operate. BHC describes itself as a "clearing broker" whose role is to "settle[ ] and clear[ ] trades and perform[ ] certain administrative and custodial functions" for so-called "introducing brokers" (or "retail brokers"), who deal with individual public customers and take securities orders from them. *See generally Stander v. Financial Clearing & Servs. Corp.,* 730 F.Supp. 1282, 1285 (S.D.N.Y.1990) (describing different functions of clearing and introducing brokers); *Katz v. Financial Clearing & Servs. Corp.,* 794 F.Supp. 88, 90 (S.D.N.Y.1992) (same). BHC is thus a middleman, receiving customer orders from introducing or retail brokers, and transferring those orders to "market makers" or "exchange specialists," who make their living by actually executing the customers' transactions in various securities markets. Order flow payments are one means by which the market makers compete with one another for the "flow" of customer orders from the introducing and clearing brokers. Market makers offer brokers cash and non-cash incentives—such as market research or reduced service charges or clearing charges—in exchange for the brokers having directed a volume of orders to the market makers.

This incentive system is called "payment for order flow."[5]

The connection between payments made to brokers for order flow and the individual customer orders that helped generate the payments is somewhat attenuated. First, market makers customarily compensate brokers only periodically—monthly or quarterly—and the amount of the payment is based upon the total volume of trades executed during that period. Second, order flow payments ordinarily are made only to brokers that have provided the market makers with a certain threshold number of (relatively small volume) orders per period, typically a minimum of 100,000 shares compiled from trades involving 3,000 or fewer shares each. Joint Appendix at 56; Report of the Payment for Order Flow Comm. of the Nat'l Ass'n of Sec. Dealers, Inc., *Inducements for Order Flow*, at 15–16 (July 1991). Thus, the individual, low-volume trades of a single customer cannot be said to generate order flow payments to the brokers. Moreover, because brokers usually receive order flow payments only at the end of a period, it is probably impossible to match particular payments with particular retail trades.[6]

For these reasons, BHC argues that the class members "jointly seek the benefits that accrued to BHC from [ ] aggregated order flow." Appellee's Brief at 19. According to BHC, therefore, "the amount in controversy is based on a common right in which each putative class member has a common and undivided interest." *Id*. We are presented with a close question, tenaciously argued on both sides, but ultimately we disagree with BHC's analysis and conclude that the plaintiffs' claims to BHC's order flow payments are separate and distinct and cannot be aggregated to satisfy the amount in controversy.

Because the class members in this case do not in any sense possess joint ownership of, or an undivided interest in, a common res, their claims based on order flow payments are separate and distinct. Plaintiffs in paradigm "common fund" cases assert claims to a piece of land, a trust fund, an estate, an insurance policy, a lien, or an item of collateral, which they claim as common owners or in which they share a common interest arising under a single title or right. Gilman and his putative class have no *joint* interest other than a shared appetite for a money judgment payable by a single defendant—which is not the type of "common and undivided interest" that warrants an exception to the rule against aggregating claims. Under the rule of *Snyder, Zahn,* and the other cases cited herein, the plaintiffs' claims should have been dismissed for failure to satisfy the requisite amount in controversy.

1. *Aggregation of Order Flow Payments.*

BHC's primary argument emphasizes that order flow payments depend on the "aggregate volume" of trading orders provided to market makers and cannot be traced to specific orders placed by individual investors. Therefore, BHC asserts, the claim here is "based on a common right" in which each class member has a common and undivided interest; and because the claim seeks to capture the benefits that accrued to BHC from the aggregation of customer orders, the entire amount of the order flow payments should be "considered in the aggregate" for purposes of determining the amount in controversy. We disagree.

All of BHC's customers allegedly suffered similar losses due to BHC's handling of their securities trades; nonetheless, though their claims are asserted together in a class action, the plaintiffs never *possessed* anything in common prior to the litigation. The only

---

5. BHC asserts that "[p]ayment for order flow is a well recognized, industry-wide practice, permitted by the self-regulating organizations that monitor the securities industry." Appellee's Brief at 5. Because we have limited our inquiry here to determining whether the nature and use of order flow payments warrant the aggregation of claims related to those payments for jurisdictional purposes, we do not consider arguments that bear on the merits of Gilman's claims—such as BHC's arguments concerning the legitimacy or legality of its actions.

6. In BHC's words, "no individual customer's order alone resulted in BHC receiving [order flow] payments, ... [and] the payments [are not] attributable to any individual transactions." Appellee's Brief at 19.

right or title allegedly held by the customers is the right to sue BHC for the undisclosed extracontractual benefit that BHC derived from their securities trades; that right is distinct to each plaintiff, and is based on BHC's handling of that person's separate transactions. Had this case proceeded to the stage of class certification in either the state or federal court, it seems clear that each class member would have had the right to opt out of the class.[7] The facts that BHC pooled the plaintiffs' trading orders to receive benefits, and that the market makers conferred such benefits on the basis of the monthly volume of orders that they received, does not mean that the plaintiffs held joint title to the total volume of their orders or to the aggregate of the allegedly wrongful order flow payments generated by such volume.

7. Under Rule 23(c)(2) of the Federal Rules of Civil Procedure, a class action based on common "questions of law or fact" among the claimants—as was pleaded in this case—requires notice to each class member advising that "the court will exclude the member from the class if the member so requests." Fed.R.Civ.P. 23(c)(2). Similarly, N.Y.C.P.L.R. § 904 (McKinney 1976) requires that in all class actions *not* brought primarily for injunctive relief—also the case here— "reasonable notice of the commencement of [the] class action shall be given to the class," the content of such notice to be based in part on a consideration of "the likelihood that significant numbers of represented members would desire to exclude themselves from the class." N.Y.C.P.L.R. § 904(b) and (c). *See also* N.Y.C.P.L.R. § 903 (McKinney 1976) ("The order permitting a class action shall describe the class[; and] the court may limit the class to those members who do not request exclusion from the class . . . ."); *id.* Supplementary Practice Commentary by Honorable Joseph M. McLaughlin (McKinney 1976 & Supp.1997) ("it is hard to conceive of a case where a class action [for monetary damages] may proceed without giving the class members the option to opt out"). Obviously, plaintiffs who can opt out cannot be considered parties "necessary" to the determination of the rights at stake; and the object of the plaintiffs' suit in such a case therefore does *not* constitute "a single indivisible res . . . that cannot be adjudicated without implicating the rights of everyone involved with the res." *Bishop v. General Motors Corp.*, 925 F.Supp. 294, 298 (D.N.J.1996).

8. BHC distinguishes *Dumont* on the ground that the plaintiffs in that case sought damages "based entirely upon their own individual stock purchases," while the plaintiffs here seek "disgorgement of all payment for order flow, whether attributable to a particular transaction or not."

*See Dumont v. Charles Schwab & Co., Inc.*, Civ. A. No. 95–0606, 1995 WL 262262, at *5 (E.D.La. May 4, 1995) ("The fact that the order flow payment was in a lump sum is irrelevant—each of the plaintiff's claims [is] separate and distinct and based upon their own individual stock transactions through Schwab.").[8]

The complaint alleges that BHC breached contractual and fiduciary duties to its customers by accepting "the payment of cash . . . in return for BHC executing *the customer's order* with [a] market maker. . . . [W]hen the plaintiff, or another class member, would execute an order[,] . . . BHC would retain [an order flow payment] for its own benefit and not that of *its customer*." Joint Appendix at 12–13 (emphasis added).[9]

Appellee's Brief at 29 n. 11; *see Dumont*, 1995 WL 262262, at *5. We note in the next section of this opinion our disagreement with BHC's characterization of Gilman's complaint, and our belief that the plaintiffs' claims are consistent with a demand for damages based on their individual transactions with BHC. *See infra*, at 1426. Moreover, there is nothing pleading-specific in the *Dumont* court's conclusion that— despite the defendant's contention that order flow payments are "an aggregate transaction based upon the volume of individual transactions"—each plaintiff in that case "could assert on their own a claim for the violations alleged." *Dumont*, 1995 WL 262262, at *5. Here, as in *Dumont*, if the plaintiffs succeed in their claims "each plaintiff will only be entitled to reimbursement for his or her own claim and the quantum will depend entirely upon the amount of stock that each purchased through [BHC]." *Id.* Any other principle of distribution would be adopted *faute de mieux*.

BHC also fails adequately to distinguish *Gilman v. Wheat, First Secs., Inc.*, 896 F.Supp. 507 (D.Md.1995), another case filed by the named plaintiff here, based upon nearly identical claims. Although, as BHC notes, the defendants in that case did *not* ground their removal of Gilman's claims on the "exception to the non-aggregation rule" for common and undivided interests, BHC ignores the district judge's conclusion in *Wheat* that this exception, in any event, "d[id] *not* apply to the case at bar" because "each class plaintiff could sue in her own right for all the relief requested by the class." 896 F.Supp. at 509 n. 4 (emphasis added).

9. The complaint further states that "plaintiff and the class members suffered not only the loss of [order flow payments] which properly belonged to *them*, but also received less or paid more in the execution of *their transactions* than they

On the face of the complaint, therefore, the plaintiffs' suit alleges that BHC's receipt of order flow payments harmed each individual customer in the conduct of that customer's individual securities transactions. Not coincidentally, the SEC regulations requiring disclosure of · order flow payments compel brokers to disclose to their customers (in confirmation of securities transactions) not only "whether payment for order flow is received by the broker or dealer for transactions in [that type of] securities," 17 C.F.R. § 240.10b–10(a)(7)(iii), but also—upon an individual customer's written demand—"the source and nature of the payment for order flow [that is] received *in connection with the particular transaction*" of that individual customer. Payment for Order Flow, SEC Release No. 34–34902, 59 Fed.Reg. 55,006, 55,010 (Nov. 2, 1994) (emphasis added).

In short, although the class action device allows the plaintiffs to combine their claims for convenience, neither that form of action nor the nature of order flow payments permits the aggregation of the· plaintiffs' separate and .distinct claims so as to satisfy the amount in controversy.

### 2. *Recovery From a Single Fund.*

BHC's second major argument in support of federal jurisdiction is that the class members have a "common and undivided interest" in recovering from a "fund," and that the total value of that fund should be used to determine whether the jurisdictional minimum has been reached. BHC bases this argument on its assertion that the plaintiffs "seek[ ] disgorgement of *all* benefits of payments for order flow" received by BHC, "whether identifiable to a particular transaction or not." Appellee's Brief at 17 (emphasis in original). Because this right to disgorgement (BHC contends) necessarily

depends on the theory that BHC breached a fiduciary duty to the class as a whole, the object of the plaintiffs' suit can only be to "share in the[ ] fruits [of BHC's breach] based on the *total amount of disgorgement,*" and not on the basis of individual plaintiffs' trades with BHC. *Id.* at 22 (emphasis added). BHC thus concludes that the claims to recover its order flow payments are "held jointly by the plaintiffs," and the "entire amount of the benefits ... [should] be considered for jurisdictional purposes." *Id.* at 17.

Preliminarily, BHC's reading of the complaint overstates the contentions and goals of the class. The complaint (1) alleges that "plaintiff and the other members of the class are entitled to recover any monies paid as kickbacks or commercial bribes to BHC on customer transactions"; and (2) seeks a judgment "[r]equiring ... BHC to pay to plaintiff and the members .of the class the amount of kickbacks and other inducements received from market makers for the execution of customer orders." Joint Appendix at 16, 20. While BHC views these passages as a "specific claim" that BHC disgorge all order flow payments that it received for all of its customer transactions, "whether identifiable to a particular transaction or not," Appellee's Brief at 17, 19, we think this reading adds considerable gloss. The quoted sections of the complaint are not at all inconsistent with a collective demand by the class members for the disgorgement of order flow payments received in respect of their individual transactions, as accurately as that amount can be calculated.[10]

Even if BHC's reading of the complaint were sound, the plaintiffs' claims still cannot be aggregated because the class members have no common and undivided interest in the "fund" of damages that they might re-

---

would have paid if BHC diligently had searched for the best execution available without regard to its own personal profit." Joint Appendix at 17 (emphasis added).

**10.** The complaint explains the receipt of order flow payments as "the payment of cash by the market maker to BHC in return for BHC executing *the customer's order* with the market maker," so that "when the plaintiff, or another class member, would execute *an order* ... BHC would

retain [the order flow payment] for its own benefit and not that of *its customer.*" Joint Appendix at 13 (emphasis added). "As a result, plaintiff and the class members suffered ... the loss of [order flow payments] which properly belonged to *them....*" *Id.* at 17 (emphasis added). Given the context, we do not believe that the language of Gilman's complaint alone satisfies BHC's burden of establishing that the claims here should be aggregated because the plaintiffs seek to recover from a common fund.

ceive. BHC's argument to the contrary rests almost entirely on the First Circuit's opinion in *Berman v. Narragansett Racing Ass'n*, 414 F.2d 311 (1st Cir.1969), which we think is inapposite. In *Berman*, a group of racehorse owners filed class actions to collect prize money allegedly owed to them by three race tracks under similar purse agreements. 414 F.2d at 312. The substantive issue was whether the race tracks, which had paid the winning horse owners 44.7% of the track's ticket sales proceeds, also owed them 44.7% of what the tracks took in as "breakage"— the small change that the tracks pocketed after rounding their bettors' payouts down to the lowest dime. *Id.* at 313. Reversing prior dismissals for lack of jurisdiction, the First Circuit held that the amount in controversy was the total amount of breakage sought by the plaintiffs as prize money, and not each plaintiff's individual share of it. *Id.* at 314–15, 317. The court held that the horse owners' interest in the money was "common and undivided," and analogized their lawsuit to traditional "common fund" cases such as a shareholder's derivative action or a suit against a trustee by the distributees of an estate. *Id.* at 315.

BHC contends that, just as the "fund as a whole" was created to benefit either the tracks or the owners "as an entity" in *Berman*, the order flow payments in this case belong either to BHC or "to the purported class as an entity" because no individual customer transactions could generate the payments. But the crucial fact upon which *Berman* turned is that, under the disputed purse agreements in that case, no single plaintiff could claim an individual entitlement to any portion of the disputed prize money, because the agreements obligated the tracks to pay a certain percentage of their annual shares "to the *group of owners* whose horses win purses." 414 F.2d at 313, 315 (emphasis added). The agreements "create[d] no specific rights in any individual winner," but instead gave the owners "an integrated right against the tracks." *Id.* at 315 n. 10. The First Circuit explicitly distinguished *Berman* from cases such as *Oliver v. Alexander* (cited in *Shields v. Thomas, supra*), in which each plaintiff in a joint action sues on his own rights under his own separate contract. *Id.* at 315–16.

If the rationale of *Berman* is sound, it does not apply here, where Gilman alleges (and BHC does not for present purposes dispute) that BHC accepted order flow payments for handling securities transactions involving the class members' individual trading orders. BHC's argument—that its disgorgement of order flow payments would produce a common fund in which all class members would have a common and undivided interest—proceeds from the wrong point: the disgorgement of the payments to create the "fund." Such a "fund" is created to facilitate the litigation process in virtually every class action, and has nothing necessarily to do with whether the plaintiffs shared a pre-existing (pre-litigation) interest in the subject of the litigation.

Under the classic "common fund" cases, what controls is the nature of the right asserted, not whether successful vindication of the right will lead to a single pool of money that will be allocated among the plaintiffs. *See Pierson v. Source Perrier, S.A.*, 848 F.Supp. 1186, 1188 (E.D.Pa.1994) (rejecting a claim that the "plaintiffs' request for disgorgement of profits ... creates a 'common and undivided interest,'" because "[t]he proper focus should [ ] be upon the ... nature and value of the rights that [the plaintiffs] have asserted"). To call any recovery that a class might win a "fund" to which the class plaintiffs are jointly entitled is "merely added verbiage. There is no fund. The claim remains one on behalf of ... separate individuals for the damage suffered by each due to the alleged ... conduct of defendant...." *Rock Drilling Local Union No. 17 v. Mason & Hanger Co.*, 217 F.2d 687, 695 (2d Cir.1954) (employees' allegation that union official's bribe-taking reduced their wages and impaired their working conditions was "a series of separate and distinct claims" that could not be aggregated to satisfy the amount in controversy).

In summary, BHC points to certain unitary characteristics of the plaintiffs' claims in order to avail itself of the "common fund" doctrine: the aggregation of the stock transactions on which order flow payments are made; the overall benefit that BHC derives

from those payments (and that Gilman seeks to capture); and the single pot that would be created to receive and distribute damages. But these features of the case do not demonstrate a unitary claim; they merely reflect the problems of theory and proof in this case, and the named plaintiff's efforts to solve or plead around them.

Reliance on the aggregation of the transactions is Gilman's attempt to deal with the facts that (i) the benefit to BHC cannot be assigned to particular transactions or to activity in any single customer's account, and that (ii) any harm to plaintiffs is similarly elusive. Reliance on the device of a single pot from which the claimants would draw their damages is Gilman's effort to deal with the fact that damages (if any) cannot be proven or distributed on the basis of any single customer's transactions. It is of course commonplace to collect class action damages wholesale, put the proceeds in a single fund, and distribute the proceeds retail upon a showing of specific entitlement in accordance with the judgment. Thus, the aggregation of transactions and the pooling of damages are simply expedients of litigation and pleading that facilitate Gilman's efforts: (a) to show the existence of a duty to him and the other class members; (b) to demonstrate causation sufficient to justify reallocating the order flow payments from BHC to its customers; and (c) to collect damages for any or all of the claimants.

BHC's effort to aggregate the transactions and damages in this case fails to satisfy its burden of proof concerning the amount in controversy.

## C. *The Punitive Damages Claim.*

BHC's third argument is that it "believes" that the plaintiffs as a class will seek punitive damages exceeding $50,000, and that this full amount should be deemed the amount in controversy for jurisdictional purposes because "claims for punitive damages are, by their nature, collective and should be treated as a common and undivided claim for jurisdictional purposes." Appellee's Brief at 17. BHC relies on a line of authority that has developed for the proposition that where multiple plaintiffs file a joint claim for punitive damages, the total sum claimed should be attributed to each individual plaintiff in determining whether each has satisfied the $50,000 jurisdictional minimum. *See, e.g., Allen v. R & H Oil & Gas Co.,* 63 F.3d 1326, 1335 (5th Cir.1995); *Tapscott v. MS Dealer Serv. Corp.,* 77 F.3d 1353, 1359 (11th Cir.1996). We decline to adhere to that principle.

Gilman's prayer for punitive damages does not specify a dollar amount. BHC expresses its "belie[f]" that such damages will "undoubtedly" exceed $50,000, but offers no proof of the amount likely to be claimed. We have held that "if the jurisdictional amount is not clearly alleged in the plaintiff's complaint, and the defendant's notice of removal fails to allege facts adequate to establish that the amount in controversy exceeds the jurisdictional amount, federal courts lack diversity jurisdiction as a basis for removing the plaintiff's action from state court." *Lupo v. Human Affairs Int'l, Inc.,* 28 F.3d 269, 273–74 (2d Cir.1994). Moreover, because the right to remove a state court action to federal court on diversity grounds is statutory, federal courts review compliance with the removal statute "narrowly, resolving any doubts against removability." *Id.* at 274 (quoting *Somlyo v. J. Lu–Rob Enters., Inc.,* 932 F.2d 1043, 1045–46 (2d Cir.1991)).

BHC's conclusory prediction as to the *amount* of damages that the plaintiffs will claim is arguably insufficient to carry its burden of establishing by a preponderance of evidence the amount in controversy. *See McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *United Food & Commercial Workers Union, Local 919 v. Centermark Properties Meriden Square, Inc.,* 30 F.3d 298, 304–05 (2d Cir.1994). Nonetheless, we are disinclined to decide this jurisdictional issue on a basis that is so easily controlled by the techniques of pleading. We therefore address whether claims for punitive damages necessarily should be aggregated for jurisdictional purposes, and decide that they should not.

BHC relies principally on *Allen,* 63 F.3d at 1335, in which the Fifth Circuit held that multiple plaintiffs' joint claims for punitive

damages from an oil and gas well explosion satisfied the amount in controversy because, under Mississippi law, the whole of the alleged punitive damages could be attributed to each individual plaintiff (for jurisdictional purposes). In arriving at its conclusion, the court stated that it was applying principles from *Snyder, Zahn,* and the classic "common fund" cases. The factors that the court examined in particular were (1) whether the state law claim at issue "creates one right of recovery" in the plaintiffs; and (2) whether the defendant in the case had any "interest in the apportionment of an award among the plaintiffs." *Allen,* 63 F.3d at 1331.

As to the first factor, the Fifth Circuit determined that punitive damages under Mississippi law were "fundamentally collective," and that each plaintiff had "an integrated right to the full amount" of any such award. *Id.* at 1333–34. This was because the primary purpose of punitive damages in Mississippi was to protect society "by punishing and deterring wrongdoing," and because there can be no claim of right to punitive damages, which are always within the discretion of the trier of fact. *Id.* at 1333. As to the second factor, the court acknowledged that defendants faced "the potential for multiple liability" for punitive damages, and that plaintiffs' "undivided interest" in being awarded such damages therefore could not be considered "common in the sense that there is one and only one award that they would split equally." *Id.* at 1334. Notwithstanding the "seeming anomaly of multiple

exposures," the Fifth Circuit refused to hold that the punitive damages claims were separate; this harsh result, the court concluded, was justified by (and tolerated as a price of) the public goals of punishment and deterrence.[11] *Id.*

*Tapscott,* issued after BHC filed its brief in this appeal, held that punitive damages claims based on alleged statutory violations in the sale of automobile service contracts could be considered in the aggregate for purposes of determining the amount in controversy. 77 F.3d at 1359. The *Tapscott* court followed *Allen* by looking to the nature of punitive damages under state law. The Eleventh Circuit found that in Alabama (as in Mississippi), the purposes of punitive damages were deterrence and punishment; injured parties were not entitled to punitive damages "as a matter of right"; and defendants were "not concerned with the particular distribution of the punitive damages among the plaintiffs, but with the overall size of any such award." *Id.* at 1358–59. The court concluded, therefore, that the punitive damages sought in that case were "a single collective right in which the putative class ha[d] a common and undivided interest." *Id.* at 1359.[12] Several district courts applying other states' laws have followed *Allen* and *Tapscott. See, e.g., In re Norplant Contraceptive Prods. Liab. Litig.,* 907 F.Supp. 244, 246 (E.D.Tex.1995) (Texas law); *Gilmer v. Walt Disney Co.,* 915 F.Supp. 1001, 1013–14 (W.D.Ark.1996) (Arkansas law); *Brooks v.*

---

**11.** The Fifth Circuit denied rehearing and rehearing en banc in *Allen,* but in so doing it explicitly qualified its earlier holding: "[T]he panel is of the unanimous view that the opinion in this case specifically reflects a result under the Mississippi law of punitive damages and is not to be construed as a comment on any similar case that might arise under the law of any other state." *Allen v. R & H Oil & Gas Co.,* 70 F.3d 26 (5th Cir.1995) (per curiam).

Significantly, the *Allen* opinion never holds that plaintiffs share a common and undivided interest in punitive damages. Rather, the court concluded that punitive damages "do not fall neatly into either the 'non-aggregation' caselaw or the 'common and undivided interest' exception," and only the "unique nature" of punitive damages under Mississippi law permitted their aggregation for jurisdictional purposes. *Allen,* 63 F.3d at 1333. As one court has observed, the Fifth Circuit in *Allen* thus "created its own

unique exception to *Zahn." Bernard v. Gerber Food Products Co.,* 938 F.Supp. 218, 222 (S.D.N.Y.1996).

**12.** The Eleventh Circuit expressly limited its decision in *Tapscott:* "Our holding in this case is not to be taken to establish a bright line rule that any class claim for punitive damages may be aggregated to meet the amount-in-controversy requirement." 77 F.3d at 1359. While concluding that the facts in that case warranted aggregation, the court made clear that "other factual situations may dictate that punitive damages are non-aggregable," and indicated that one such situation might be where punitive damages "would be determined on an individualized consideration of the egregiousness of the harm done to individual class members." *Id.* at 1359 & n. 13.

*Georgia Gulf Corp.,* 924 F.Supp. 739, 741 (M.D.La.1996) (Louisiana law).

We decline to join the courts holding that punitive damages claims are by nature "common and undivided" and therefore aggregable for jurisdictional purposes. We think that the rule in *Snyder, Zahn,* and other cases bars the aggregation of punitive damages claims absent a prior determination that the underlying claim—the basis on which such damages are sought—asserts a single title or right. *See Zahn,* 414 U.S. at 294, 94 S.Ct. at 508; *see also Visintine v. Saab Automobile A.B.,* 891 F.Supp. 496, 498 (E.D.Mo.1995) ("[I]t can[not] be said that class members seeking punitive damages are seeking to enforce 'a single title or right ...' where, as here, they do not have such an interest in the underlying actual damages. Rather, their claims for punitive damages are as separate and distinct as their claims for actual damages."); *Bernard v. Gerber Food Products Co.,* 938 F.Supp. 218, 223 (S.D.N.Y. 1996) (where class members' false advertising claims "derive from the individual injury each plaintiff suffered" and those "injuries do not constitute a 'common and undivided interest,'" the plaintiffs' punitive damages, like their other damages, "must be determined individually and cannot be aggregated"); *Haisch v. Allstate Ins. Co.,* 942 F.Supp. 1245, 1250 (D.Ariz.1996) (declining to aggregate punitive damages claims where underlying claim alleged refusal to pay insureds' medical expenses, because "each class member's claim for punitive damages is derived from conduct on the part of Defendant that allegedly injured each class member separately and individually").

BHC's common fund argument on punitive damages is substantially similar to its common fund argument on the underlying claim, which we have rejected. Gilman and the putative class members may indeed share an interest in receiving damages, but that has nothing to do with whether—prior to litigation—they jointly held a single title or right in which each possessed a common and undivided interest. It is irrelevant whether successful vindication of claims would create a single pool of recovery to be allocated among multiple plaintiffs; a common interest in a pool of funds is not the type of interest that permits aggregation of claims under the "common fund" doctrine. *See Visintine,* 891 F.Supp. at 499 (to hold that " 'all plaintiffs have a collective interest in the creation of a fund sufficient to punish and deter any alleged misconduct on the part of the defendant' ... is clearly not what the Supreme Court had in mind in *Snyder* and *Zahn* ").

One feature of "common and undivided" interests in a single title or indivisible res is that the rights to such interests cannot be determined without implicating the rights of every other person claiming a similar entitlement. Manifestly, punitive damages do not work that way. As the court in *Allen* acknowledged, punitive damage claims entail the "potential for multiple liability." 63 F.3d at 1334. It cannot be denied that Gilman and his putative class members could "sue separately for punitive damages, and, whether they prevail[ed] on the merits or not, whether they [were] awarded punitive damages or not, the rights of subsequent plaintiffs [would] remain unaffected." *See Bishop v. General Motors Corp.,* 925 F.Supp. 294, 298 (D.N.J.1996). Punitive damages claims thus cannot be deemed the type of single, indivisible res in which—under the classic "common fund" analysis—multiple plaintiffs share a common and undivided interest that justifies aggregation. Claims for punitive damages, like claims for compensatory damages, are "brought together in a class action only for the convenience of the plaintiffs." *Id.; see also, e.g., Hasek v. Chrysler Corp.,* No. 95–C–579, 1996 WL 48602, at *4 n. 5 (N.D.Ill. Feb. 5, 1996) ("[T]hat the members of [the] putative class have filed a single punitive damages claim does not mean that their rights are suddenly joint and undivided rather than individual.... [R]ather, each potential class member could advance a separate punitive damages claim in a separate lawsuit without affecting the class claim. It is thus readily apparent that [the class] ha[s] chosen to proceed with a single punitive damages claim ... for the sake of economy and convenience, and thus fall[s] squarely within the non-aggregation rule of *Zahn.*"); *Haisch,* 942 F.Supp. at 1250 (same).

We hold, therefore, that punitive damages asserted on behalf of a class may not be aggregated for jurisdictional purposes where, as here, the underlying cause of action asserted on behalf of the class is *not* based upon a title or right in which the plaintiffs share, and as to which they claim, a common interest. To hold otherwise, and aggregate punitive damages even when the actual damages could not be aggregated, "would eviscerate the holdings of *Snyder* and *Zahn* and would run counter to the strict construction of the amount-in-controversy requirement those cases mandate." *Visintine,* 891 F.Supp. at 499. *See also Hasek,* 1996 WL 48602, at *4 n. 5 ("[T]o permit the rule advocated by *Allen* would effectively render *Zahn* meaningless whenever a class seeks to recover punitive damages."); *Haisch,* 942 F.Supp. at 1251 ("Extending the ['common fund'] exception to the non-aggregation rule would allow practically any sizeable class of plaintiffs to invoke diversity jurisdiction regardless of how miniscule their claims might be.... *Allen* and *Tapscott* [thus] undermine[ ] the underlying bases for imposing the amount in controversy requirement, namely, to limit the federal docket to substantial cases.").

Even if we were to follow the Fifth and Eleventh Circuits, and allow the aggregation issue to turn on the nature of punitive damages under state law, we think that the New York law of punitive damages supports (or at the very least does not contradict) our conclusion. It is true that in New York (as in Mississippi and Alabama) "the purpose of punitive damages is solely to punish ... and to deter," *Zurich Ins. Co. v. Shearson Leh-*

man Hutton, Inc., 84 N.Y.2d 309, 316, 618 N.Y.S.2d 609, 612, 642 N.E.2d 1065, 1068 (1994), and the questions whether to award punitive damages and how much to award "reside in the sound discretion of the original trier of the facts." *Nardelli v. Stamberg,* 44 N.Y.2d 500, 503, 406 N.Y.S.2d 443, 445, 377 N.E.2d 975, 977 (1978). But New York courts also emphasize that a demand for punitive damages "is parasitic and possesses no viability absent its attachment to a substantive cause of action." *Rocanova v. Equitable Life Assurance Soc'y,* 83 N.Y.2d 603, 616, 612 N.Y.S.2d 339, 344, 634 N.E.2d 940, 945 (1994). Thus, because a plaintiff cannot recover punitive damages unless he "assert[s] an underlying cause of action upon which a demand for punitive damages can be grounded," *id.,* "there can be no separate cause of action for punitive damages." *Id.,* 83 N.Y.2d at 617, 612 N.Y.S.2d at 345, 634 N.E.2d at 946 (internal quotations and citations omitted). Even under *Allen* and *Tapscott,* based on "nature of state law" analysis, punitive damages claims asserted under New York law would not be aggregated for jurisdictional purposes unless the plaintiffs share a common and undivided interest in a single title or right.[13]

## CONCLUSION

For the reasons set forth above, we vacate the judgment of the district court and remand with instructions to remand to state court.

---

**13.** The Supreme Court reaffirmed in *BMW of North America, Inc. v. Gore,* —— U.S. ——, ——, 116 S.Ct. 1589, 1601, 134 L.Ed.2d 809 (1996), that punitive damages offend due process unless they "bear a 'reasonable relationship' to compensatory damages." While the Court made clear that the ratio of punitive damages to compensatory damages cannot be fixed by a "simple mathematical formula," *id.* at ——, 116 S.Ct. at 1602, the Court concluded that the "breathtaking 500 to 1" ratio in that case merited close judicial scrutiny. *Id.* at ——, 116 S.Ct. at 1603.

Given the small individual claims assertable by Gilman and the putative class members in this case, a $50,000 punitive damage award to each or any member of the class would likewise "'raise a suspicious judicial eyebrow,'" *id.* at

——, 116 S.Ct. at 1603 (quoting *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 481, 113 S.Ct. 2711, 2732, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting)), and run afoul of *Gore.* The parties agree that the typical order flow payment consists of no more than one to two cents per share of stock traded. *See, e.g.,* Joint Appendix at 56. Even assuming a two-cent per share payment on a customer's trade of 3,000 shares—usually the maximum number of shares per order in these transactions, *id.*—any resulting order flow payment to BHC would be approximately $60. This figure is less than 1/800th of the $50,000 in punitive damages that BHC would have us attribute to each class member for jurisdictional purposes.