**In re: REZULIN PRODUCTS LIABILITY LITIGATION**

**No. 00 CIV. 2843(LAK).**

United States District Court, S.D. New York.

Oct. 16, 2001.

See also 133 F.Supp.2d 272.

Seth Lesser, Javier Bleichmar, Bernstein, Litowitz, Berger & Grossman, New York City, for Plaintiff Charlie Fae Hopkins.

David Casso, Casso & Pettitt, L.L.P., McAllen, TX, for Plaintiff Berta Soto.

Mark W. Davis, Ron M. Feder, Davis & Feder, Gulfport, MS, for Plaintiff Beatrice Bell.

Peter D. Derbes, Frank A. Silvestri, John P. Massicot, Silvestri & Massicot, New Orleans, LA, for Plaintiff Chris Polehouse.

Andy D. Birchfield, Mark Englehart, Montgomery, AL, for Plaintiffs Flora Floyd and Lizzie White.

Charles M. Noteboom, Noteboom—The Law Firm, Hurst, TX, for Plaintiff Carol Brown.

Christopher E. Sanspree, Birmingham, AL, for Plaintiff Olivia Cochran.

David Klingsberg, Alan E. Rothman, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City, for Defendants Parke–Davis and Warner–Lambert Co.

Linda L. Maloney, D. Michael Wallach, Charles Florsheim, Wallach & Moore, P.C., Fort Worth, TX, for Defendant James R. Terry, M.D.

## MEMORANDUM OPINION

KAPLAN, District Judge.

These eight actions are among the hundreds seeking recovery for personal injuries allegedly resulting from the use of the prescription diabetes medication Rezulin, formerly manufactured by defendants Warner–Lambert Co. and its Parke–Davis division, that have been consolidated here for pretrial proceedings by the Judicial Panel on Multidistrict Litigation. Each of these eight originally was commenced in a state court and removed by defendants on the basis of diversity of citizenship. The matter now is before the Court on plaintiffs' motions to remand on the ground that subject matter jurisdiction is lacking.

These motions come on the heels of this Court's disposition of motions to remand in sixteen other cases transferred to this Court as part of the same multidistrict proceeding. Familiarity with the prior opinion is assumed.[1]

### I. Alabama Actions

■ In two Alabama actions,[2] defendants claim plaintiffs fraudulently joined an Alabama sales representative, Kam

---

1. *In re Rezulin Prods. Liab. Litig.*, 133 F.Supp.2d 272 (S.D.N.Y.2001) (hereinafter *Rezulin I*).

2. The Alabama actions are *Floyd v. Warner–Lambert Co.*, No. 00 Civ. 965, and *White v. Warner–Lambert Co.*, No. 00 Civ. 966.

Wyatt, whose presence is said to destroy complete diversity. For the reasons stated in *Rezulin I*, plaintiffs have failed to state a claim under Alabama law against the sales representative. In particular, plaintiffs have not alleged "that [they] suffered injury caused by one who sold a defective product," a requirement under the Alabama Extended Manufacturers Liability Doctrine (the "AEMLD"), as "there is nothing in the complaint indicating that the defendant sales representative sold Rezulin to [plaintiffs or plaintiffs' physicians]."[3]

Plaintiffs argue that the AEMLD does not subsume all claims arising from injury resulting from a defective product, despite this Court's prior decision to the contrary.[4] Yet even assuming that the AEMLD does not subsume negligent failure to warn claims,[5] the only distinction between such claims brought under the AEMLD or under a common law negligence theory is that an inadequate warning constitutes negligence *per se* under the AEMLD,[6] while plaintiffs under the latter must show a lack of due care to establish negligence.[7] This distinction is immaterial to the question of whether plaintiffs have alleged proximate cause, as they must to state a claim under either theory.[8] Because Alabama adheres to the learned in-

---

**3.** *Rezulin I*, 133 F.Supp.2d at 286–87.

**4.** *See* Floyd and White Reply Mem. at Point A, first paragraph (no page numbers provided) (referring to 133 F.Supp.2d at 281 n. 10) (citing *Johnson v. General Motors Corp.*, 82 F.Supp.2d 1326, 1329 (S.D.Ala.1997); *Veal v. Teleflex, Inc.*, 586 So.2d 188, 190–91 (Ala. 1991)).

**5.** The post-*Veal* Alabama Supreme Court cases to which plaintiffs cite arguably support only a separate theory of negligent failure to warn. *See Clarke Industries, Inc. v. Home Indemnity Co.*, 591 So.2d 458 (Ala.1991); *Deere & Co. v. Grose*, 586 So.2d 196 (Ala. 1991). The other cases cited by plaintiffs either are distinguishable or support this Court's holding that negligence claims against a manufacturer, seller or distributor in a products liability action are subsumed by the AEMLD. *Flagstar Enterprises, Inc. v. Davis*, 709 So.2d 1132 (Ala.1997), was not a products liability action. *Cessna Aircraft Co. v. Trzcinski*, 682 So.2d 17 (Ala.1996), involved the standard for awarding punitive damages pursuant to an Alabama statute. The AEMLD does not dispense with negligence; rather it dictates that the one who manufactures, sells, or distributes a defective product is negligent *per se;* subject to certain allowable affirmative defenses, the plaintiff need not prove a lack of due care. *See Casrell v. Altec Industries, Inc.*, 335 So.2d 128, 132–33 (Ala.1976); *Atkins v. American Motors Corp.*, 335 So.2d 134, 141 (Ala.1976). Thus it is that *Yarbrough v. Sears Roebuck & Co.*, 628 So.2d 478 (Ala.1993), addressed negligent failure to warn as a claim alleged under the AEMLD. Although *Ford Motor Co. v. Burdeshaw*, 661 So.2d 236 (Ala. 1995), discusses negligence as a viable theory separate from claims alleged under the AEMLD, it relies for this proposition on a pre-*Veal* case, *General Motors Corp. v. Edwards*, 482 So.2d 1176 (1985). Thus, there is no indication that *Veal*'s holding has been undermined by subsequent decisions of the Alabama Supreme Court. Certainly the Eleventh Circuit, to which this Court defers in interpretation of Alabama law, *see Factors, Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2d Cir. 1981), adheres to that view. *See, e.g., Spain v. Brown & Williamson Tobacco Corp.*, 230 F.3d 1300, 1310 (11th Cir.2000) (negligence and wantonness claims merge into claim under AEMLD) (citing *Veal*). Here, plaintiffs allege that defendant Wyatt "was in the business of marketing, selling and distributing the pharmaceutical Rezulin." Floyd and White Cpts ¶ 7. Their claims therefore fall under the AEMLD.

**6.** *See Stone v. Smith, Kline & French Laboratories*, 447 So.2d 1301, 1304 (Ala.1984) ("the adequacy of the warning issued by a drug manufacturer bears on whether a plaintiff has proved a prima facie case under the [AEMLD]").

**7.** *See Atkins*, 335 So.2d at 139.

**8.** *See, e.g., Clarke Industries*, 591 So.2d at 461–62 ("Under both the AEMLD and the negligence theories, [plaintiff] has the burden of proving proximate causation.").

termediary doctrine, in order to establish proximate cause in a prescription drug failure to warn claim, whether founded on the AEMLD or common law negligence, a plaintiff must show that the defendant failed to warn the prescribing physician.[9] Plaintiffs here have failed to allege that Wyatt proximately caused plaintiffs' injuries by failing to warn plaintiffs' prescribing physicians of the dangers of Rezulin. In fact, plaintiffs make no specific allegations against Wyatt at all, instead attributing wrongdoing to the collective "defendants," none of whom is alleged to have had any dealings with plaintiffs' prescribing physicians.[10]

For his part, defendant Wyatt has submitted an affidavit in which he denies that he sold or took orders for Rezulin, marketed or advertised Rezulin to the general public, or had any direct dealings with plaintiffs.[11] Plaintiffs have not submitted

any evidence undermining defendants' position. Rather, they rejoin that the affidavit leaves open to question whether Wyatt had any dealings with plaintiffs' physicians and, notwithstanding the complaint's failure to allege any such connection, urge that remand should be granted because further discovery might establish proximate cause.[12]

While this is a motion to remand rather than for summary judgment, the analogy to summary judgment practice is instructive.[13] Rule 56(f) provides:

"Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or

---

**9.** Proximate causation in a failure to warn claim for prescription drugs, whether founded on the AEMLD or common law negligence, means that plaintiff must show that the defendant failed to warn the prescribing physician. *See, e.g., Stone,* 447 So.2d at 1304, ("manufacturer's duty to warn is limited to an obligation to advise the *prescribing physician* of any potential dangers that may result from the drug's use") (emphasis added); *see generally Rezulin I,* 133 F.Supp.2d at 282 (discussing doctrine as it applies to sales representatives of drug manufacturers).

**10.** *See Rezulin I,* 133 F.Supp.2d at 291 (denying remand where plaintiffs failed to make specific allegations against pharmacy defendants).

**11.** Def. Exs. 7, 8, ¶ 4.

**12.** *See* Floyd and White Reply Mem. at Point B ¶¶ 3, 4. Plaintiffs' counsel has submitted to chambers copies of a motion to stay consideration of the motion to remand pending further discovery, as well as a memorandum and affidavit in support of the motion to stay. However, plaintiffs' counsel has neglected to file these documents with the Clerk of Court.

The Court therefore will not consider them. *See In Re Rezulin Prods. Liab. Litig.,* MDL No. 1348(LAK), Pretrial Order No. 21 (S.D.N.Y. June 7, 2001). This order is not meant to be draconian. Motions not filed with the Clerk of Court are not part of the record. See Fed. R.App. P. 10. It is simply unworkable for a court presiding over a Multidistrict Litigation with cases numbering in the hundreds to keep track of motions that are not docketed. Although plaintiffs here and in several other cases that are the subject of this opinion have failed also to file their reply papers in support of the motions to remand, the Court considers the replies nonetheless, as neither Pretrial Order No. 14 nor Pretrial Order No. 21 clarified filing procedures with respect to reply papers. The Court therefore has docketed reply papers not properly filed. It will not do so in the future.

**13.** *See, e.g., Jackson v. Pneumatic Production Corp.,* No. Civ. A. 00–3615, 2001 WL 238214, at * 3 (E.D.La. March 6, 2001) (request for further discovery prior to a decision on motion to remand is "akin to the procedural vehicle available in the context of a motion for summary judgment under Fed.R.Civ.P. 56(f) to request a continuance").

discovery to be had or may make such other order as is just."

A party seeking relief under Rule 56(f) therefore must submit an affidavit showing "(1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." [14] Although the failure to file such an affidavit perhaps is not conclusive on a motion to remand, as Rule 56(f) does not apply in literal terms,[15] the essential policy of Rule 56(f)—that a party resisting a motion supported by competent evidence cannot defeat the motion with arrant speculation about what discovery might show—nevertheless is applicable.

Although plaintiffs have put forth arguments as to how discovery might create a genuine issue of material fact, a court in deciding a motion to remand must look to the allegations in the complaint, rather than to plaintiffs' wishful speculation as to what allegations might be made in an amended complaint following discovery.[16] Granting discovery in such a case as this would allow plaintiffs to name anyone as a defendant in a lawsuit without making the allegations necessary to state a claim upon which relief might be granted and then to seek discovery in hope of finding a basis for a claim. Plaintiffs, moreover, seek to profit from the inadequacies of their complaints by pointing to ostensible "omissions" in Wyatt's affidavit. Yet the affidavit was drafted in response to plaintiffs' allegations, and the failure to deny allegations that plaintiffs have not made does not create a disputed issue of fact. Even granting that Rule 56(f) does not apply with full rigor, there nevertheless must exist a minimum of legally sufficient allegations in order to merit discovery pending decision on the motion. Otherwise, the request for discovery becomes one "to find out if [the party] has a claim, rather than that it has a claim for which it needs additional discovery. [This is] not the object of the discovery procedures outlined in the Federal Rules of Civil Procedure." [17] As plaintiffs have made no allegations against the sales representative that, if proven, would entitle them to relief, and have shown no basis for supposing that discovery would enable them to do so, their request for discovery and the motions to remand the Alabama cases are denied.

## II. Mississippi Actions

Plaintiffs in three Mississippi actions assert claims against Mississippi pharmacies, pharmacists, doctors, and a home health care provider.[18] For the reasons stated in

---

**14.** *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999) (quoting *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995)).

**15.** *See, e.g., Jackson,* 2001 WL at *3 (granting request for further discovery on motion to remand despite lack of affidavit satisfying 56(f) requirements in interest of justice). Although plaintiffs' counsel submitted an affidavit in support of plaintiffs' purported motion to stay, it, along with the motion, was not filed with the Clerk of Court and accordingly is not here considered. *See supra* note 12.

**16.** *See Rezulin I,* 133 F.Supp.2d at 284 and n. 5 (Motions to remand must be determined

"based on the pleadings. Federal courts across the nation have relied upon that standard to deny remand based on inadequate pleadings and to disregard allegations not contained in the complaint.") (citing cases).

**17.** *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994).

**18.** The Mississippi cases are *Polehouse v. Parke–Davis,* No. 01 Civ. 971, which alleges claims against pharmacies and a home health care provider; *Bell v. Warner–Lambert Co.,* No. 01 Civ. 973, which alleges claims against doctors and pharmacists; and *Cochran v.*

*Rezulin I,* the Court holds that the pharmacists and pharmacies have been joined improperly. Their presence is immaterial for diversity purposes.[19]

In *Polehouse v. Parke–Davis,*[20] defendants argue that the home health care provider was joined fraudulently and, in any case, that plaintiffs who do not assert claims against the home health care provider were misjoined. In response to the motion to remand in *Bell v. Warner–Lambert Co.,*[21] defendants argue that plaintiffs who do not assert claims against the non-diverse physician defendants were misjoined with plaintiffs who assert such claims.

### A. Improper Joinder of Home Health Care Provider

■ In *Polehouse,* defendants claim that plaintiffs fraudulently joined Gilbert's Home Health Agency ("Gilbert's"), a home health care provider that allegedly contributed to the death of plaintiff Howard Lee Cothern by "failing to coordinate with physicians the discontinuation of Rezulin ... when Rezulin was withdrawn from the market," specifically through the actions of one Gilbert's employee who allegedly "continued to administer and dispense Rezulin to Howard Cothern after [Rezulin] had been removed from the market ...."[22] Defendants do not dispute the legal sufficiency of plaintiffs' allegations. Rather, they challenge their truth.

Defendants submit two affidavits of Michelle Pollard, director of clinical services at Gilbert's, who states that Gilbert's obtained all prescription medications, including Cothern's Rezulin, from Cothern or his caregiver, on the prescription of a physician and without any involvement of Gilbert's employees, and that Gilbert's simply provided Rezulin to Cothern in a pill box based on the dosage information provided on the drug container labels.[23] Plaintiffs have submitted a Gilbert's list of Cothern's medications in which Rezulin was crossed out with the note "D/C" while troglitazone (the generic name for Rezulin) was not crossed out. In response, Pollard states that employee Polyanna Temple crossed out Rezulin "in order to delete the duplicative listing."[24] Pollard states further that Gilbert's continued to place Rezulin in Cothern's pill box until March 28, when employee Carol Smith realized that Cothern's Rezulin prescription had not been discontinued and informed a Dr. Janes that Rezulin had been taken off the market, whereupon Janes terminated the prescription.[25] In response to these affidavits, plaintiff Ouida Dupree, Cothern's daughter and primary caregiver, has submitted an affidavit in which she states that on March 30, Smith, a replacement nurse for Cothern's daily care nurse, Kimberly Ross, "was appalled to find out that Mr. Cothern had been dispensed Rezulin by Ms. Ross," immediately informed Dupree that Cothern was not supposed to be taking Rezulin as it had been taken off the market, and thereupon called Gilbert's to alert it to the situation.[26]

---

*Warner–Lambert Co.,* No. 01 Civ. 972, which alleges claims against pharmacies.

19. *See Rezulin I,* 133 F.Supp.2d at 288–90.

20. No. 01 Civ. 971.

21. No. 01 Civ. 973.

22. *Polehouse* Cpt ¶¶ 45, 46.

23. *See* Def. Compendium of Auth., Ex.5 (Pollard 10/10/00 Aff.) ¶ 5, Ex. 6 (Pollard 11/13/00 Aff.) ¶¶ 4, 5.

24. Pollard 11/13/00 Aff. ¶ 5.

25. *Id.* at ¶ 6.

26. Pl. Renewed Motion for Remand, Ex. 3 (Dupree Aff.) ¶¶ 11, 12.

The Pollard affidavits and attached documents do not constitute competent, admissible evidence relieving Gilbert's of all potential liability. First, Pollard's statements regarding Smith's communications with Dr. Janes are hearsay.[27] The statements regarding the lack of physician involvement in Temple's crossing out and marking "D/C" next to Rezulin on Cothern's medications list, her thoughts and state of mind when doing so, and Smith's thoughts and state of mind when communicating with Dr. Janes could not have been based on Pollard's personal knowledge.[28] In particular, without the intentions Pollard ascribes to Temple's actions, an equally viable interpretation of the document is that Cothern's physician ordered Rezulin discontinued, but Temple did not realize that troglitazone was the same medication and therefore did not mark it discontinued.[29]

Pollard attaches supporting documents, namely (1) a "Physician Communication Note," which contains a note, apparently signed by Smith on March 28, indicating that Cothern was taking Rezulin and that Rezulin had been removed from the market, and a note apparently signed by a Gilbert's nurse on March 28 reflecting Dr. Janes' alleged order to discontinue Rezulin[30] and (2) a "Physician Verbal Order," which notes Dr. Janes' alleged March 28 order to discontinue Cothern's Rezulin prescription and to dispense a new medication, apparently signed by a Gilbert's employee.[31] Pollard authenticates the attached documents and attests they were created and maintained in the ordinary course of business.[32] Plaintiffs do not dispute the admissibility or authenticity of the documents or the signatures contained therein, but rather limit their objections to Pollard's hearsay statements. Nevertheless, this Court does not see fit to permit removal on the basis of these documents.

First, the documents—records of alleged communications between Dr. Janes and Gilbert's regarding discontinuation of Cothern's prescription—contradict Pollard's statements that "Cothern's physician did not provide any prescription for any of Cothern's medications ... to Gilbert's or any of its employees," and that Cothern "obtained the medications ... on the prescription of a physician, without any in-

27. The Court notes that Pollard's affidavit does not state that Janes was Cothern's physician. Rather, the affidavit states that "Carol Smith noticed that Cothern's prescription for Rezulin had not been discontinued by his physician ... and she provided this information to Dr. Julian Janes." Pollard 11/13/00 Aff. ¶ 6. The next sentence states that "Dr. Janes discontinued Rezulin," thus implying that he had originally prescribed it to Cothern. As plaintiffs do not dispute that Janes was Cothern's physician, the Court assumes it to be the case.

28. Although Pollard purports to have "personal knowledge of the matters contained" in the affidavit, see Pollard 11/13/00 Aff. ¶ 2, Pollard does not state she was present with Temple or Smith at the time in question, and in any event could not have personal knowledge of either's state of mind. Pollard's statements are more likely the result of specula-

tion, her examination of the attached records, or else statements each employee made to Pollard regarding the incidents; such statements would be hearsay if offered for their truth.

29. Although Pollard states that Gilbert's did not receive prescriptions from physicians, see Pollard 11/13/00 Aff. ¶ 4, this statement conflicts with the Physician Communication Note and the Physician Verbal Order attached to the affidavit, both Gilbert's records on the face of which Dr. Janes discontinues Rezulin and prescribes a new medication.

30. Pollard 11/13/00 Aff. Ex. B (included in defendants' original removal papers).

31. The signature is illegible.

32. *Accord* Fed.R.Civ.P. 56(e).

volvement by Gilbert's or its employees,"[33] raising doubts as to the veracity of either the statements or the documents. Second, the documents do not remove the possibility that Ross, a registered nurse,[34] herself took responsibility for managing Cothern's prescription medications and made an error with respect to Rezulin. Any belated verbal order from Janes could have been meant to remedy Ross's error. Third, the documents' only proof of the date of Janes' order comes from notes of Gilbert's employees. There is no dated physician's signature on the Physician's Communication Note, but rather a signature of another person (apparently a Gilbert's employee) dated March 28 and that person's note that Dr. Janes made a verbal order to Gilbert's to discontinue Rezulin.[35] Nor is Dr. Janes's signature on the Verbal Order dated; the only record of the order date on that document comes from Gilbert's. While not passing judgment on the veracity of the verbal order date as indicated in the records, the Court finds that the documents fail to meet the stringent burden imposed on defendants to show that plaintiff's allegations "are so clearly false and fictitious that no factual basis exists for an honest belief on the part of plaintiff that there is liability."[36] In light of the inadmissibility of the Pollard statements and the supporting documents' failure conclusively to show that Janes was solely responsible for Cothern's Rezulin prescription and that he failed to discontinue the prescription prior to March 28, defendants

have failed to show that plaintiff's allegations against Gilbert's are without basis in fact.[37] Accordingly, the joinder of Gilbert's was appropriate.

### B. Misjoinder of Plaintiffs

Defendants in *Polehouse* and in *Bell* argue in the alternative that plaintiffs with valid claims against diverse defendants were misjoined with plaintiffs who do not assert valid claims against diverse defendants.

Misjoinder of parties occurs when a party fails to satisfy the conditions for permissive joinder under Rule 20(a). Rule 20(a) provides in relevant part:

> "All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences, and if any question of law or fact common to all these persons will arise in the action."[38]

### 1. Polehouse

■ In *Polehouse*, plaintiffs alleging claims against the drug manufacturers alone join plaintiff Dupree, who alleges also the claims against Gilbert's, the home health care provider. While Dupree's additional claims against the health care provider for negligent administration of Rezulin after its withdrawal from the market do not arise out of the same transaction or occurrence as the claims against the drug

---

**33.** Pollard 11/13/00 Aff. ¶ 4.

**34.** *See* Dupree Aff. ¶ 5. Defendants do not dispute this.

**35.** *See* Pollard 11/13/00 Aff. Ex. B. The line marked "physician's signature" reads "VO Dr. James."

**36.** *Rezulin I,* 133 F.Supp.2d at 281 (internal quotations omitted).

**37.** Plaintiffs argue also that they assert valid claims against Gilbert's for negligent catheter care. However, there were no such allegations made in the complaint and the Court therefore does not consider them.

**38.** Fed.R.Civ.P. 20(a).

manufacturers for negligent marketing and distribution and failure to warn, this alone does not establish misjoinder. A plaintiff need only assert "any" claim arising out of the same transaction or occurrence or series of transactions or occurrences as the other plaintiffs[39] and "need not be interested in obtaining or defending against all the relief demanded."[40] Thus, the question is whether Dupree makes at least one claim that arises out of the same transaction or occurrence or series of transactions or occurrences as the claims of her co-plaintiffs. Although case law on the question conflicts in certain respects, the Court determines she does not.

In the *Diet Drugs* litigation, Judge Bechtle found that plaintiffs alleging claims against drug manufacturers almost identical to those alleged here were misjoined because "the claims of plaintiffs who have not purchased or received diet drugs from an identical source, such as a physician, hospital or diet center, did not satisfy the transaction or occurrence requirement."[41] Similarly, in *Simmons v. Wyeth Laboratories, Inc.*,[42] the court found that plaintiffs alleging similar claims against drug manufacturers were misjoined because "plaintiffs do not allege the exact nature of their injuries or damages, other than averring that plaintiffs experience one or more of numerous injuries and side effects."[43] In short, plaintiffs' allegations could not "be said to have arisen from the same basic set of facts."[44] The same reasoning applied in the *Bone Screws* litigation, where Judge Bechtle framed the relevant question as whether "the central facts of each plaintiff's claim arise on a somewhat individualized basis out of the same set of circumstances" and found that "joinder based on the belief that the same occurrence or transaction is satisfied by the fact that claimants have the same or similar device of a defendant manufacturer implanted in or about their spine is ... not a proper joinder."[45] These cases thus suggest that the joinder of Dupree, with her claim against Gilbert's, with other plaintiffs lacking such a claim was improper.

Plaintiffs seek a different conclusion, relying on *Abraham v. Volkswagen of America, Inc.*[46] The Second Circuit there held that several plaintiffs' uniform allegations of an automobile valve stem seal defect constituted "logically related transactions," and therefore were joined properly, although plaintiffs had purchased their cars from different sources, had been in separate accidents and suffered separate injuries.[47] But *Abraham* does not control here.

---

**39.** *See Mosley v. General Motors Corp.*, 497 F.2d 1330, 1334 (8th Cir.1974) (Rule 20(a) only requires a single basis of commonality, either in law or fact for joinder to be acceptable); *Mesa Computer Utilities, Inc. v. Western Union Computer Utilities*, 67 F.R.D. 634, 637 (D.Del.1975) (Rule 20 does not require precise congruence of all factual and legal issues).

**40.** Fed.R.Civ.P. 20(a).

**41.** *In re Diet Drugs*, No. Civ. A. 98–20478, 1999 WL 554584, at *4 (E.D.Pa. July 16, 1999). Judge Bechtle rejected plaintiffs argument that "issues of duty, breach of duty, proximate cause and resulting harm are common to all the Plaintiffs." *Id.*

**42.** Nos. 96 CV 6631, 6686, 6728, 6730, 1996 WL 617492 (E.D.Pa. Oct.24, 1996).

**43.** *Id.* at *1.

**44.** *Id.*

**45.** *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1341, 1995 WL 428683, at *1–2 (E.D.Pa. July 15, 1995).

**46.** 795 F.2d 238 (2d Cir.1986).

**47.** *Id.* at 251. *See also Dayton Ind. Sch. Dist. v. U.S. Mineral Prods. Co.*, Nos. Civ. A. B–87–00507, B–88–00429, 1989 WL 237732, at *3 (E.D. Tex.—Beaumont Div. Feb. 14, 1989)

Unlike cases involving a pure product defect, toxic tort cases raise more complicated issues of causation and exposure. This is not, as was *Abraham*, a situation with an identical product defect allegedly causing identical results—breakage of the valve stem seal—which in turn caused different injuries depending on the circumstances of the particular accident.[48] The plaintiffs in *Polehouse* allege a defect (or defects) the precise contours of which are unknown and which may have caused different results—not merely different injuries—in patients depending on such variables as exposure to the drug, the patient's physical state at the time of taking the drug, and a host of other known and unknown factors that must be considered at trial with respect to each individual plaintiff. They do not allege that they received Rezulin from the same source or that they were exposed to Rezulin for similar periods of time. As in *Simmons*, they do not allege injuries specific to each of them so as to allow the Court to determine how many plaintiffs, if any, share injuries in common.[49] Joinder "of several plaintiffs who have no connection to each other in no way promotes trial convenience or expedites the adjudication of asserted claims."[50] For these reasons, plaintiffs in *Polehouse* are misjoined.

■ This, however, is not the end of the inquiry. When defendants assert misjoinder as a ground for removal, the issue becomes more complex. Although misjoinder is a ground for dismissal or severance of an improperly joined party, the vast majority of courts confronting the issue on remand motions have found that misjoinder of a party with a unique claim against a non-diverse adversary is not alone a basis for remand. One treatise suggests that this is because improper joinder does not defeat the possibility of a claim against the misjoined party, as is required to satisfy the traditional standard

(applying *Abraham* reasoning to permit joinder of plaintiffs alleging unreasonable hazards of asbestos and seeking recovery of costs for removal).

**48.** *Abraham*, 795 F.2d at 251 ("All plaintiffs now allege as the basis for their claims the purchase of a Volkswagen Rabbit with a valve stem seal made of defective material that will cause it to harden and break over time.").

**49.** Judge Bechtle dismissed the claims of those plaintiffs not residing in Alabama, the state in which the complaint originally was filed, upon finding that "plaintiffs do not allege they received the drugs from the same source or any other similar connection," and in particular that "plaintiffs do not allege that they received or purchased diet drugs in Alabama." *Id.* at *3. *See also Simmons v. Wyeth Lab., Inc.*, 1996 WL 617492, at *4 (severing plaintiffs misjoined under similar circumstances).

**50.** *In re Diet Drugs*, 1999 WL 554584, at *3. *See also Nassau County Assn. of Ins. Agents, Inc. v. Aetna Life & Cas. Co.*, 497 F.2d 1151, 1154 (2d Cir.), *cert. denied,* 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974) (misjoinder of 164 defendant insurance agents where plaintiffs alleged "no connection at all between the practices engaged in by each," actions charged "were separate and unrelated," and termination of policies occurred "at different times for different reasons with regard to different agents"); *Kenvin v. Newburger, Loeb & Co.*, 37 F.R.D. 473 (S.D.N.Y.1965) (misjoinder of defendant stockholders where, although "wrongdoing of each defendant was identical, the loans and securities involved and the dates on which the transactions were entered into differed ... plaintiffs had alleged unrelated acts which happened to involve violations of the same ... duty").

Although under this analysis it is likely that many of the plaintiffs in this multidistrict litigation are misjoined, in the interests of efficiently directing the court's resources to the pretrial coordination efforts designated it by the Multidistrict Panel, the Court addresses here only joinder that affects federal jurisdiction, leaving transferee courts on remand to consider misjoinder of remaining parties. *See In re Diet Drugs*, 1999 WL 554584, at *5.

for fraudulent joinder in discounting the citizenship of non-diverse parties.[51] Thus, courts considering the issue generally have looked for the additional element of a bad faith attempt to defeat diversity, defining misjoinder of this type as a third species of fraudulent joinder.[52]

Defendants rely on *Tapscott v. MS Dealer Service Corp.*[53] for the proposition that "it is just as improper to join plaintiffs who have no connection to a non-diverse defendant as it is to join plaintiffs who have no connection with one another."[54] *Tapscott* involved, in effect, a merger of two entirely distinct lawsuits. One group of plaintiffs representing a putative class sued one group of defendants for statutory fraud arising from the sale of automobile service contracts. Another group of plaintiffs representing a separate putative merchant class sued another group of defendants for statutory fraud arising from the sale of extended service contracts in connection with the sale of retail products. The court held the defendants misjoined because on the face of the complaint there was not one claim against them even remotely arising from the same transaction or occurrence. All that the claims shared was an invocation of the Alabama fraud statute, rendering joinder "so egregious as to constitute fraudulent joinder."[55]

This is a different situation. Here, all plaintiffs arguably assert at least one claim in common against the drug manufacturers. Nevertheless, it is clear that the joinder of plaintiff Dupree in particular destroys diversity. While it may not rise to the level of the egregious misjoinder in the sense that Dupree's claims have at least an empirical, if not a transactional, relationship to the claims of all the other plaintiffs, it is not clear why the standard used in *Tapscott* with respect to misjoined defendants necessarily applies to misjoined plaintiffs. Arguably a plaintiff's right to choose among defendants and claims—the principal reason for imposing a strict standard of fraudulent joinder to effect removal—is not compromised where claims of co-plaintiffs are severed or dismissed. This is not to say the cost and efficiency benefits to joined plaintiffs are immaterial; they simply do not carry the same weight when balanced against the defendant's right to removal. While aware that several courts have applied *Tapscott*'s egregiousness standard when considering misjoinder of plaintiffs in the context of remand petitions,[56] this Court

---

**51.** 14B Charles Allen Wright, Et Al., Federal Practice And Procedure: Jurisdiction 2B (hereinafter "Wright") § 3723, at 657 (3d ed.1998).

**52.** *See Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353, 1360 (11th Cir.1996), *abrogated on other grounds, Cohen v. Office Depot*, 204 F.3d 1069 (11th Cir.2000). Unlike the other types of fraudulent joinder—lack of any possibly legally sufficient claim against the defendant or outright fraud in the pleading of jurisdictional facts—where the plaintiff's intent to defeat diversity is immaterial to showing merely colorable or bad faith allegations, *see* 14B Wright § 3723, at 629 (citing cases), intent to destroy diversity becomes an element in fraudulent misjoinder, most likely because, unlike frivolous or false allegations,

mere misjoinder of parties does not always indicate bad faith.

**53.** 77 F.3d 1353.

**54.** Def. Mem. at 22.

**55.** *Tapscott,* 77 F.3d at 1360.

**56.** *See, e.g., In re Diet Drugs*, 1999 WL 554584 at \*3 (although plaintiffs were "clearly misjoined," to ignore citizenship of misjoined plaintiffs, "court must find that the joinder is so egregious that it constitutes fraudulent joinder because it wrongfully deprives Defendants the right of removal"); *Lyons v. American Tobacco Co.*, No. Civ. A. 96–0881, 1997 WL 809677, at \*3 (S.D.Ala. Sept. 30, 1997)(denying remand where misjoinder of

respectfully takes another path.[57]

Accordingly, as the plaintiffs have been misjoined, and the misjoinder of plaintiff Dupree in particular destroys diversity, the Court will sever her action for purposes of maintaining the defendants' right to removal of the remainder of the action.

### 2. Bell

■ In *Bell,* eleven plaintiffs have joined to sue Warner–Lambert, five physicians, and three pharmacists. As discussed above, the pharmacists have been joined improperly, and their citizenship therefore is disregarded for the purposes of determining this Court's jurisdiction. Only five of the plaintiffs in *Bell* assert claims against a non-diverse physician defendant.[58] The defendants do not argue that the defendant-physicians have been fraudulently joined, but rather that the five plaintiffs with claims against the non-diverse physicians have been misjoined with the plaintiffs asserting no claim against non-diverse defendants. If the eleven plaintiffs in *Bell* have been properly joined, the entire case would have to be remanded to the Mississippi state courts, as the claims against the five Mississippi doctors would destroy complete diversity.

As noted earlier, the first test for whether plaintiffs have been properly joined is whether they make at least one claim that arises out of the same transaction or occurrence or series of transactions or occurrences as the claims of their co-plaintiffs.[59] Because the five plaintiffs with allegations against their physicians allege a specific source of Rezulin, as well as a specific series of occurrences that led to their injuries, that is different from the series of occurrences related to the injuries of the remaining six plaintiffs, they have been misjoined. As discussed above, the Court recognizes the cost and efficiency benefits to joined plaintiffs, but these benefits must be weighed against a defendant's right to removal. Because the misjoinder of the five plaintiffs with claims against non-diverse physicians would destroy complete diversity, the Court will sever those five actions so as to preserve the defendants' right to removal in the remaining actions.

### III. Texas Actions

■ In two Texas actions,[60] defendants have removed on the theory that plaintiffs improperly have joined physicians (and, in

---

plaintiffs was "transparent artifice to defeat diversity" and therefore constituted fraudulent joinder) (citing *Tapscott*); *Koch v. PLM Int'l,* No. Civ. A. 97–0177, 1997 WL 907917 (S.D.Ala. Sept. 24, 1997) (same).

**57.** It is worth noting that *Tapscott*'s "egregious" standard has been criticized even in the context of misjoinder of defendants. *See, e.g.,* 14B WRIGHT § 3723 at 658 (noting that "the complexity [involved in a federal court's decision regarding removal jurisdiction] is increased if the Eleventh Circuit's admonition that not all procedural misjoinder rises to the level of fraudulent misjoinder is accepted and because numerous additional decisions will be needed to clarify the distinction."). WRIGHT suggests one way to avoid the morass is for defendants to remove only after obtaining severance of misjoined plaintiffs in state court. This suggestion highlights the inconsistency of requiring stricter standards for severing misjoined parties once cases are removed to federal court; although the inconsistency may be justified in the case of misjoined defendants, for the reasons discussed above, it is not justified in the case of misjoined plaintiffs.

**58.** Plaintiffs Henry Andrews, Mary Gavin, David Burden, Willie Louise Campbell, and Agnes Poole assert claims of medical malpractice, negligence, and failure to warn against their respective physicians.

**59.** *See supra* note 39.

**60.** The actions are *Brown v. Warner–Lambert Co.,* No. 01 Civ.1967 and *Soto v. Warner Lambert Co.,* No. 01 Civ. 976.

*Brown,* a nurse and a health provider practice group). They contend that plaintiffs in each failed to file an expert report with the state court as required by Texas statute in order to pursue a medical malpractice claim against a physician or health care provider, thus rendering the claims against the non-diverse health care providers insufficient and making the cases removable.[61]

The relevant statute requires the filing of such a report no later than 180 days after the filing of the action and, in the event of the claimant's failure to do so, requires the court, "on the motion of the affected physician or health care provider," to dismiss the action with prejudice. It provides three possible means of extending the deadline for filing. First, the court may "for good cause shown after motion and hearing" extend the time period by thirty days.[62] Second, the affected parties may agree in writing, signed by both parties and filed in the court, to extend the deadline.[63] Third, the court may order a thirty day grace period for compliance if upon a hearing it is shown that the failure of the claimant was not intentional or the result of conscious indifference but rather the result of accident or mistake.[64] Under the statute, " 'affected parties' means the claimant and the physician or health care provider who are directly affected by an act or agreement required or permitted under this section and does not include other parties to an action who are not

directly affected by that particular act or agreement." [65]

Defendants argue that plaintiffs failed to file their expert reports before the statutory deadline, that they do not meet any of the three statutory requirements for extension of the deadline, and that a Texas state court would be obliged under the statute to dismiss the claims against the providers. As a result, defendants argue, there is no possibility that plaintiffs may recover against them, rendering the non-diverse health care providers fraudulently joined and the action removable. Plaintiffs counter that the Texas statute makes clear that dismissal is mandated only "on the motion of the affected physician or health care provider" [66] and that no motion has been made. Accordingly, they contend that the non-diverse citizenship of these providers is material.

Defendants rely principally on *Garza v. Pfizer, Inc.*[67] and *American Transitional Care Centers of Texas, Inc. v. Palacios* [68] for the proposition that the lack of motions to dismiss by the providers does not matter. Neither case, however, supports the weight defendants place upon it. *American Transitional* involved, *inter alia,* a motion by the defendant hospital to dismiss for failure to file an expert report by the deadline. Thus, it did not address whether a court must, or even could, dismiss an action for failure to comply with the deadline absent motion by either a health care provider or physician defendant.[69]

**61.** *See* TEX. CIV. CODE ANN. Art. 4590i § 1301(d) (Vernon 2000).

**62.** *Id.* § 1301(f).

**63.** *Id.* § 1301(h).

**64.** *Id.* § 1301(g).

**65.** *Id.* § 1301(r)(1).

**66.** *Id.* § 1301(e).

**67.** No. M–01–028 (S.D. Tex. April 19, 2001), *adopted and approved* May 9, 2001, *motion for reconsideration pending* (attached in Def. Compendium of Auth., Ex. 2).

**68.** 46 S.W.3d 873, 2001 WL 491205 (Tex. May 10, 2001).

**69.** Although the Court notes in passing that "if the plaintiff fails within the time allotted . . . to provide the expert reports . . . the trial court must sanction the plaintiff by dismissing

In *Garza*, Pfizer removed an action based on plaintiff's failure to file an expert report by the statutory deadline, although the physician defendant had not moved to dismiss the case against him. The magistrate judge, and subsequently the district court, found that the physician defendant's failure to move for a dismissal was not fatal to Pfizer's removal because "Section 1301(e) ... gives courts virtually no latitude in the consideration of extraneous and subjective factors." [70] Yet the defendant physician's failure to file a motion under Section 1301(e) is not extraneous or subjective; it is an objective barrier to any dismissal by the court. Moreover, in *Garza* the affected parties had signed an agreement to extend the deadline but had not filed it with the Court, thus taking the case out of Section 1301(h).

*Garza* therefore is not persuasive on this point. The language of the Texas statute is clear that dismissal of an action for failure to file an expert report requires a motion of either the physician or health care provider defendant. In the absence of any decision to the contrary by the Texas Supreme Court, this Court is bound to assume that the Texas Supreme Court would apply the statute as its text dictates to allow an action against a physician or health care provider to proceed absent those defendants' election to take advantage of Section 1301(e).[71] As the physicians in *Brown* and *Soto* have not moved under Section 1301(e),[72] this Court finds there is a possibility that plaintiffs could recover against the physicians in those cases. The motions to remand those cases will be granted.

### IV. Hopkins

The plaintiff in *Hopkins v. Pfizer Inc.*[73] also moves to remand, asserting that the claim does not involve the requisite $75,000 matter in controversy. As this Court explained in *Rezulin I*:

"Defendants, as the party invoking federal jurisdiction, carry the burden of 'proving to a reasonable probability that the claim is in excess of the statutory jurisdictional amount.' On the other hand, the focus of defendants' efforts need not be whether the plaintiff is likely to secure an amount greater than $75,000. Rather, the focus is on the claim, and while 'plaintiff is the master

---

the case with prejudice," it does so merely to cursorily summarize Section 1301(e) for background purposes; the section described by the Court is *dicta* and in fact not at all pivotal to the case, which concerns the adequacy of a report properly filed within the extended deadline allotted pursuant to Sections 1301(f) and (g) following the hospital's motion to dismiss. Certainly it does not trump the clear statutory language of Section 1301(e).

**70.** *Garza*, No. M–01–028, at 5.

**71.** Section 1301(g) also supports this reading. It crafts the time period for a request for an extension based on accident or mistake around the defendant's motion to dismiss, stating the claimant's motion for an extension "shall be considered timely if it is filed before any hearing on a motion by a defendant under [1301(e)]." If a court could dispose of a plaintiff's case solely on their failure to file an expert report by the deadline, the timeliness standard for a motion under § 1301(g) would be rendered a nullity.

The Court notes also that the statute's clear language does not on its face undermine the statute's goals of alleviating vexatious and frivolous litigation, *see* Tex. Civ. Stat. Ann Art. 4590i § 1.02(a). In not mandating dismissal absent the consent of physician and hospital defendants, the statute allows those faced with medical malpractice suits the option of defending the case on the merits—an option physicians with a particularly strong defense might prefer to prevailing "on a technicality."

**72.** In fact, James Terry, M.D., the physician defendant in *Brown*, has submitted a brief in support of plaintiffs' motion to remand.

**73.** No. 01 Civ. 484.

of its claim whose monetary demand is to be accorded deference,' a plaintiff's claim must be made in good faith. To determine whether defendants' burden has been met, this Court looks not only to the complaint, but to any other evidence in the record." [74]

█ The plaintiff in *Hopkins* purports to represent a nationwide class consisting of "[a]ll persons who took Rezulin from January 1, 1997 through March 22, 2000 and that have not been advised by a medical professional that she or he has any symptoms as a result of Rezulin ingestion." [75] Plaintiff seeks "injunctive and equitable relief" in the form of a

> "court-supervised medical monitoring trust fund to provide for a medical monitoring program that would include ... (a) Locating persons who use or used Rezulin and notifying them of the potential harm from the drug; (b) Gathering and forwarding to treating physicians information related to the diagnosis of injuries that may result from the use of Rezulin; and (c) Aiding in the early diagnosis of resulting injuries through ongoing testing and monitoring of Rezulin users." [76]

Hopkins argues that the Court lacks jurisdiction because, under *Synder v. Harris* [77] and *Zahn v. International Paper Co.,* [78] claims of individual class members may not be aggregated to meet the minimum jurisdictional amount. Defendants respond that a request for a medical monitoring trust fund falls under the "common fund" exception to the anti-aggregation principle for instances in which plaintiffs seek "to enforce a single title or right, in which they have a common and undivided interest." [79] In such situations, federal jurisdiction attaches "if their interests collectively equal the jurisdictional amount." [80]

Plaintiff argues that her case does not fall under the "common fund" exception because Second Circuit case law holds that (1) a common and undivided interest "only exists when there is a single sum of money (or *res*) against which there might be claims and as to which individual plaintiffs could not bring separate actions without diminishing the claims of other claimants;" (2) the value of the claims asserted must be analyzed in terms of the benefit conferred upon the plaintiff, rather than the cost to defendant; and (3) that a non-pecuniary, conjectural benefit may not be used as a basis for establishing jurisdiction. [81]

Plaintiff overstates the law in this Circuit. In *Gilman v. BHC Securities, Inc.,* [82]

---

**74.** *Rezulin I,* 133 F.Supp.2d at 295–96 (quoting *United Food and Commercial Workers Union v. CenterMark Properties Meriden Sq., Inc.,* 30 F.3d 298, 305 (2d Cir.1994); citing *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *Zacharia v. Harbor Island Spa, Inc.,* 684 F.2d 199, 202 (2d Cir.1982)).

**75.** *Hopkins* Cpt. ¶ 62.

**76.** *Id.* ¶¶ 86, 83. Similar claims are made in the PEC's Consolidated Amended Class Action Complaint.

**77.** 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969).

**78.** 414 U.S. 291, 294–300, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).

**79.** *Zahn,* 414 U.S. at 294, 94 S.Ct. 505 (quoting *Troy Bank of Troy, Indiana v. G.A. Whitehead & Co.,* 222 U.S. 39, 40–41, 32 S.Ct. 9, 56 L.Ed. 81 (1911)). *See also Gilman v. BHC Securities, Inc.,* 104 F.3d 1418, 1422–23 (2d Cir.1997).

**80.** *Zahn,* 414 U.S. at 294, 94 S.Ct. 505.

**81.** Pl. Reply Mem. at 3–4.

the Court merely noted that the " 'paradigm cases' allowing aggregation of claims 'are those which involve a single indivisible res, such as an estate, a piece of property (the classic example), or an insurance policy,' " and that such matters "cannot be adjudicated without implicating the rights of everyone involved with the res."[83] *Gilman* did not specifically limit common fund status, as plaintiff would have it, to situations involving a limited fund. Rather, it more broadly characterized claims that might particularly lend themselves to aggregation and even cited as an example of proper aggregation "an action by several family members of the same family to secure family social services in which they shared a common and undivided interest."[84] That example involved neither a *res*

nor a set limit on possible recovery to all plaintiffs.[85]

■ Second, although it is true that when a claim seeks primarily equitable relief, as is the case here,[86] the amount in controversy is measured "by the value of the object of the litigation" to the plaintiff,[87] one method of measuring the value of such a fund to the plaintiff is by reference to the cost to the defendant. This method does not shift the viewpoint from which value is determined or to quantify value that is otherwise speculative or conjectural; rather, it acknowledges the reality that a medical monitoring fund must be funded fully for each individual plaintiff to receive whatever benefits might result. As Judge Rakoff explained in *Katz v. Warner–Lam-*

**82.** 104 F.3d 1418.

**83.** *Id.* at 1423 (quoting *Bishop v. General Motors Corp.*, 925 F.Supp. 294, 298 (D.N.J. 1996)).

**84.** *Id.* (citing *Black v. Beame*, 550 F.2d 815, 818 (2d Cir.1977)).

**85.** Plaintiff cites also *Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291 (2d Cir.2000) and *Rock Drilling Local Union No. 17 v. Mason & Hanger Co.*, 217 F.2d 687 (2d Cir.1954), *cert. denied*, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955), but these cases are inapposite. Although plaintiffs in *Mehlenbacher* sought injunctive relief in the form of cleanup of a mine collapse, stabilization of the mine and flood control, they primarily sought compensatory and punitive damages for individual personal injuries suffered as a result of the mine's collapse. The Court appeared to deny aggregation on that ground, as it did not even address the claims for injunctive relief. *See Mehlenbacher*, 216 F.3d at 296–96 (holding claims not aggregable because "they seek recovery for their losses as individuals only," and citing *Asociacion Nacional de Pescadores a Pequena Escala o Artesanales de Colombia v. Dow Quimica de Colombia S.A.*, 988 F.2d 559, 563 (5th Cir.1993), which denied aggregation for similar personal injury claims). *Rock Drilling* involved a claim for damages suf-

fered by union members as a result of the union leader's payment of a $36,000 bribe; the Court denied aggregation because plaintiff's purported "collective" claim for the $36,000 was really a claim "on behalf of separate individuals for the damage suffered by each" as a result of the bribe.

**86.** *See Barnes v. American Tobacco Co.*, 161 F.3d 127, 132 (3d Cir.1998), *cert. denied*, 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999) (court-supervised medical monitoring fund is "paradigmatic request for injunctive relief"); *In re Diet Drugs*, No. Civ. A. 98–20626, 1999 WL 673066 (Aug. 26, 1999) (page numbers unavailable) (citing *Barnes*; *Gibbs v. E.I. DuPont De Nemours & Co.*, 876 F.Supp. 475, 479 (W.D.N.Y.1995)); *Katz v. Warner–Lambert Co.*, 9 F.Supp.2d 363, 364 (S.D.N.Y.1998) ("A claim for a medical monitoring fund is injunctive in nature." (citing *Doyle v. Coombe*, 976 F.Supp. 183, 185 n. 1 (W.D.N.Y.1997))); *Craft v. Vanderbilt Univ.*, 174 F.R.D. 396, 406 (M.D.Tenn.1996).

**87.** *Katz*, 9 F.Supp.2d at 364 (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383; *Kheel v. Port of New York Auth.*, 457 F.2d 46, 49 (2d Cir.1972); *Bernard v. Gerber Food Products. Co.*, 938 F.Supp. 218, 221 (S.D.N.Y.1996)).

*bert Co.,*[88] "in order to receive the putative benefits of the contemplated medical research, a plaintiff would have either to fund such research herself or prevail in [the] lawsuit."[89]

Plaintiff attempts to distinguish *Katz,* arguing that her claim seeks only medical monitoring and not research. However, defendants have submitted an affidavit from a managing director of Marsh, U.S.A., the world's largest insurance broker and provider of health and employment benefits administration, the subsidiaries of which "are familiar with the cost of administering court-ordered medical monitoring programs and have prepared bid packages for such programs."[90] It states that the administration of the fund that plaintiff seeks "would include, among other things, claim forms, selection of and consultation with medical personnel, verification of expenses, data collection, record retention, call centers, training of administrative personnel, as well as development of computer programs" and, even putting aside the cost of the medical monitoring itself, "the base cost for the administration of this fund and establishment of this program would be greater than $75,000."[91] Plaintiff has submitted no competent evidence in response to this affidavit. Accordingly, even assuming plaintiff's requested fund would not include medical research, defendants have met their burden of establishing to a reasonable probability that the claim is in excess of the statutory jurisdictional amount.

## V. Conclusion

The motions to remand in *Floyd,* No. 00 Civ. 965, *White,* No. 00 Civ. 966, *Cochran,* No. 01 Civ. 972, and *Hopkins,* No. 01 Civ. 484, are denied. The motions to remand in *Brown,* No. 01 Civ.1967, and *Soto,* No. 01 Civ. 976 are granted.

The motions to remand in *Polehouse,* No. 01 Civ. 971, and *Bell,* No. 01 Civ. 973, are disposed of as follows:

1) In *Polehouse,* plaintiff Ouida Dupree's action is severed from the actions of her co-plaintiffs, pursuant to Rule 21 of the Federal Rules of Civil Procedure. Plaintiff Dupree's motion to remand is granted. The motions to remand of the remaining plaintiffs in the *Polehouse* action are denied.

2) In *Bell,* the actions of plaintiffs Henry Andrews, Mary Gavin, David Burden, Willie Louise Campbell, and Agnes Poole are severed from the actions of their co-plaintiffs, pursuant to Rule 21 of the Federal Rules of Civil Procedure. The motions to remand of plaintiffs Andrews, Gavin, Burden, Campbell, and Poole are granted. The motions to remand of the remaining plaintiffs in the *Bell* action are denied.

SO ORDERED.

---

**88.** 9 F.Supp.2d 363.

**89.** *Id.* at 365. *See also In re Diet Drugs,* 1999 WL 673066 ("value of the litigation to each class member in obtaining the benefits of diagnostic testing and medical research is reasonably likely to exceed $75,000").

**90.** Def. Comp. of Auth. Ex. 10 (Connolly Aff.) ¶¶ 1, 2. Connolly also attests to having experience regarding medical monitoring, as he was "the only non-party Board Member of the Love Canal Medical Trust Fund," he has "testified before Congress concerning tort issues," and he has "served as an Advisor to the American Law Institute Reporters' Study of Enterprise Liability." *Id.*

**91.** *Id.* ¶ 3.