[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 04-11401
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 6, 2005
THOMAS K. KAHN
CLERK

D.C. Docket No. 02-81164-CV-DMM

SUSAN J. FRIEDMAN,

Plaintiff-Appellant,

versus

NEW YORK LIFE INS. CO.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 6, 2005)

Before ANDERSON and WILSON, Circuit Judges, and OWENS*, District Judge,

ANDERSON, Circuit Judge:

_____

*Honorable Wilbur D. Owens, District Judge for the Middle District of Georgia, sitting by
designation.

Plaintiff, Susan Friedman, appeals the district court's denial of her motion to remand to state court for lack of jurisdiction. This appeal stems from Friedman's suit on behalf of herself and all those similarly situated against her insurer, New York Life Insurance Co. Friedman claims that her premiums were raised in violation of certain statutory provisions of Florida law that were, she asserts, incorporated into her contract with New York Life.[1] She seeks reimbursement of the allegedly overpaid premiums, declaratory relief, and an injunction against continuing violation of Florida law. The case was brought in state court and

---

[1] Friedman asserts that New York Life has violated Fla.Code § 625.65625, which provides in relevant part:

(1) . . . an insurer that offers a group health insurance policy may not establish rules for eligibility, including continued eligibility, of an individual to enroll under the terms of the policy based on any of the following health-status-related factors in relation to the individual or a dependent of the individual:(a) Health status. (b) Medical condition, including physical and mental illnesses. (c) Claims experience. (d) Receipt of health care. (e) Medical history. (f) Genetic information.(g) Evidence of insurability, including conditions arising out of acts of domestic violence. (h) Disability.
. . .

(4)(a) An insurer that offers health insurance coverage may not require any individual, as a condition of enrollment or continued enrollment under the policy, to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled under the policy on the basis of any health-status-related factor in relation to the individual or to an individual enrolled under the policy as a dependent of the individual.

(b) This subsection does not:

1. Restrict the amount that an employer may be charged for coverage under a group health insurance policy. . .

removed by New York Life on diversity grounds. 28 U.S.C. Sec. 1332. Because we conclude that New York Life failed to satisfy the $75,000 amount in controversy requirement, we conclude that the district court was without diversity jurisdiction.[2]

## I. FACTS AND PROCEDURAL HISTORY

Friedman is a member of the American Veterinary Medical Association (AVMA), and her health plan is a group plan offered to AVMA members. At the time of her enrollment, there were three premium rating classes used by the AVMA: Standard, Standard Plus and Standard Plus 20. Due to her health history, Friedman was placed in the Standard Plus 20 rating class at enrollment, and her premium was 20% higher than the Standard premium rating class. At the time she enrolled, Standard Plus rates were 10% higher than the Standard premium rating class. Several years after she enrolled, New York Life raised the rates for the Standard Plus group to 15% higher than Standard, and for Standard Plus 20 to 50% higher than Standard. Friedman's proposed class is "all AVMA insureds in Florida rated Standard Plus and/or Standard Plus 20."

---

[2] After denial of Friedman's motion to remand, the district court dismissed the complaint pursuant to Fed. R. Civ. P. 12(b)(6). Friedman also appeals that ruling, but we do not reach that issue because we vacate on the jurisdictional ground.

The suit was originally brought in the 15th Judicial Circuit Court in and for Palm Beach County. New York Life removed on diversity grounds. Friedman moved for remand to state court, claiming that the amount in controversy requirement had not been met. The district court denied the motion, as well as a motion for reconsideration.

The district court judge did not provide any reasoning for its denial of Friedman's motion for remand to state court or her motion for reconsideration. On appeal, New York Life offers three possible bases for a finding that the amount in controversy exceeds $75,000; 1) the aggregate total of the premium increases for which class members seek reimbursement exceeds $75,000; 2) the amount in controversy is equal to the face value of Friedman's policy, which exceeds $75,000; and 3) the value of injunctive relief to the plaintiffs exceeds $75,000.

## II. DISCUSSION

Diversity is the only potential basis for jurisdiction in the instant case. As this Court explained in <u>Morrison, v. Allstate Indem. Co.</u>, 228 F.3d 1255 (11th Cir. 2000): "lower federal courts are empowered to hear only cases for which there has been a congressional grant of jurisdiction, and once a court determines that there has been no grant that covers a particular case, the court's sole remaining act is to

4

dismiss the case for lack of jurisdiction." Id. at 1261(citations omitted). As this

Court noted in Kirkland v. Midland Mortgage Co., 243 F.3d 1277(11th Cir. 2001),

"[i]n removal cases, the burden is on the party who sought removal to demonstrate

that federal jurisdiction exists. Where the plaintiff has not plead a specific amount

of damages . . . the defendant is required to show. . . by a preponderance of the

evidence that the amount in controversy" can be satisfied. Id. at 1281 n.5

(citations omitted).

A. Aggregation

In Morrison, this Court outlined the relevant framework with regards to the

aggregation issue that is the crux of this case:

> Generally, if no single plaintiff's claim satisfies the requisite amount
> in controversy, there can be no diversity jurisdiction. However, there
> are situations in which multiple plaintiffs have a unified, indivisible
> interest in some common fund that is the object of litigation,
> permitting them to add together, or "aggregate," their individual
> stakes to reach the amount in controversy threshold. As explained by
> the Supreme Court in Zahn v. International Paper Co.:
>
>> When two or more plaintiffs, having separate and
>> distinct demands, unite for convenience and economy in
>> a single suit, it is essential that the demand of each be of
>> the requisite jurisdictional amount; but when several
>> plaintiffs unite to enforce a single title or right, in which
>> they have a common and undivided interest, it is enough
>> if their interests collectively equal the jurisdictional
>> amount.

5

Zahn, 414 U.S. 291 at 295, 94 S.Ct. 505 at 508 (quoting Troy Bank of Troy, Indiana v. G.A. Whitehead & Co., 222 U.S. 39, 40-41, 32 S.Ct. 9, 56 L.Ed. 81 (1911)).

Despite pervasive criticism of the "separate and distinct" versus "common and undivided" distinction as arcane and confusing, there appears to be a common thread in the relevant case law–the presence of a "common and undivided interest" is rather uncommon, existing only when the defendant owes an obligation to the group of plaintiffs as a group and not to the individuals severally. See Eagle v. American Tel. and Tel. Co., 769 F.2d 541, 546 (9th Cir. 1985) ("[T]he character of the interest asserted depends on the source of plaintiffs' claims. If the claims are derived from rights that they hold in group status, then the claims are common and undivided. If not, the claims are separate and distinct."); National Org. for Women v. Mutual of Omaha Ins. Co., 612 F.Supp. 100, 107 (D.D.C. 1985) ("[T]he cases that allow aggregation often speak of the presence of some fund to which a plaintiff class is seeking access [, and]. . . they often involve an attempt to enforce a right that belongs to a group.").

Our predecessor court elucidated this point further in Eagle Star Ins. Co. v. Maltes, 313 F.2d 778 (5th Cir. 1963), stating: "[T]he Supreme Court has evinced a desire to give a strict construction to allegations of the jurisdictional amount in controversy, so as to allow aggregation only in those situations where there is not only a common fund from which the plaintiffs seek relief, but where the plaintiffs also have a joint interest in that fund, such that if plaintiffs' rights are not affected by the rights of co-plaintiffs, then there can be no aggregation. . . . In other words, the obligation to the plaintiffs must be a joint one." Id. at 781; see also Gilman v. BHC Secs., Inc., 104 F.3d 1418, 1424 (2d Cir. 1997) ("Plaintiffs in paradigm 'common fund' cases assert claims to a piece of land, a trust fund, an estate, an insurance policy, a lien, or an item of collateral, which they claim as common owners or in which they share a common interest arising under a single title or right.").

Morrison, 228 F.3d at 1262-63 (emphasis added in Morrison).

6

The Morrison case is similar to the instant case in several respects. It involved a class action against insurance company defendants. The issue was the $75,000 amount in controversy and whether the claims of the class members could be aggregated to reach that threshold. Also, like this case, the plaintiffs were not seeking the face amount of the policy, but rather were seeking a different amount. They sought damages for the diminished value of their wrecked vehicles after repair; in other words, they sought the difference in value between pre-wreck value and post-wreck value. In addition to their damage claims, they also sought injunctive relief. Applying the principles quoted above, this Court held that the nature of the right asserted was crucial, and that the rights asserted by the Morrison plaintiffs were separate and distinct and therefore could not be aggregated.

We conclude that Friedman and the other putative class members have separate and distinct claims, which do not constitute common and undivided claims to a common fund. Friedman and each of the other plaintiffs each claims a right to damages, namely a right to be reimbursed for the amounts that each has overpaid in premiums, which overpayments they allege violate Florida law. Each plaintiff could have brought a separate suit. If plaintiffs prevail, each plaintiff will recover precisely the amount of his or her overpayment (whether in the same or

7

different amounts) without any effect on the rights of co-plaintiffs. Moreover, there is no common fund; the plaintiffs do not seek distribution of the face amount of the policy; rather, each plaintiff seeks only reimbursement of the amount he or she overpaid in premiums.

New York Life argues that there should be aggregation because the class members here are seeking the totality of all of the overcharged amounts, such that they seek to create a fund from which class members will benefit. We reject this argument because such a fund is not the type of common fund which is required for aggregation. As the second circuit noted in Gilman:

> Such a "fund" is created to facilitate the litigation process in virtually every class action, and has nothing necessarily to do with whether the plaintiffs shared a pre-existing (pre-litigation) interest in the subject of the litigation.
>
> Under the classic "common fund" cases, what controls is the nature of the right asserted, not whether successful vindication of the right will lead to a single pool of money that will be allocated among the plaintiffs. To call any recovery that a class might win a "fund" to which the class members are jointly entitled is "merely added verbage. There is no fund. The claim remains one on behalf of ... separate individuals for the damage suffered by each due to the alleged . . . conduct of the defendant."

104 F.3d at 1427 (citations omitted). See Morrison, 228 F.3d at 1264 (citing Gilman as having explained "cogently the difference between a common fund permitting aggregation and the common fund that is usually generated in any class

8

action"). As in Gilman, the claims in the instant case remain separate and distinct claims of separate individuals for reimbursement of the amount each overpaid.

New York Life also argues that Friedman and her putative class members are mere certificate holders, and that there is only one policy which was issued by New York Life to AVMA. Indeed, the only ground upon which New York Life seeks to distinguish Morrison is that Morrison involved multiple insurance policies, whereas the instant case involves only a single insurance policy. We find New York Life's attempted distinction of Morrison to be unpersuasive. The instant plaintiffs are not asserting a claim for the proceeds of that single policy; rather, each plaintiff is asserting a claim to be reimbursed the amount of overpaid premiums which each plaintiff paid.

Also, New York Life's suggestion that the individual certificate holders do not have individual contracts with New York Life is undermined by the Florida case law. In Equitable Life Assurance Society of the United States v. Waggoner, 269 So.2d 747, 748 (4th DCA 1972), the Florida court stated: "While the authorities are divided on the question, we believe the better view to be the one which holds that under group life insurance policies there is a contract between the insurer and the individual insured, that the contract consists both of the master policy and the certificate of insurance construed together." This portion of

9

Waggoner was quoted with approval in Rucks v. Old Republic Life Ins. Co., 345 So.2d 795, 796 (4th DCA 1977), and Rucks was quoted with approval by this court in Davis v. Crown Life Ins. Co., 696 F.2d 1343, 1345 (11th Cir. 1983). See also Lutz v. Protective Life Ins. Co., 328 F.Supp.2d 1350, 1362 (S.D. Fla. 2004) (under indistinguishable facts involving a group policy, holding that each individual certificate holder had an individual policy with the insurance company, and that aggregation was not proper).

In support of its argument that certificate holders like Friedman do not have individual contracts with New York Life, and in support of its argument that this fact has crucial significance for the "common and undivided interest issue," New York Life cites Eagle v. AT&T, 769 F.2d 541 (9th Cir. 1985); Phoenix Ins. Co. v. Woosley, 287 F.2d 531, 533 (10th Cir. 1961); Bishop v. General Motors Corp., 925 F.Supp. 294, 298 (D. N.J. 1996); Broenen v. Beaunit Corp., 305 F.Supp. 688, 691-92 (E.D. Wis. 1969), aff'd, 440 F.2d 1244 (7th Cir. 1970); Edgerton v. Armour & Co., 94 F. Supp. 549 (C.D. Calif. 1950).

All of these cases are distinguishable; each involved some variation of a common fund and an undivided interest. In Eagle, plaintiffs were shareholders of a utility company and their claim was akin to a shareholders' derivative suit. 769 F.2d at 547. Broenen also involved shareholder plaintiffs. The trust indenture

10

they jointly held prohibited each from taking any action that would affect the rights of others. 305 F.Supp. at 692. In Edgerton, plaintiffs were all shareholders or assignees of a dissolved corporation. 94 F.Supp. at 549. In Phoenix, the parties were seeking distribution of the proceeds of a fire insurance policy, and had a common and undivided interest in the claim. 287 F.2d at 533.[3]

Indeed, New York Life can point to no case in this or any other circuit allowing aggregation for jurisdictional purposes where each plaintiff has a claim of the kind described above – i.e., one which plaintiff could have brought separately; in which the amount received does not vary depending upon whether other plaintiffs join or drop out; and in which a potential plaintiff's non-

_____

[3] New York Life does point to one aggregation case, Black v. Beame, 550 F.2d 815, 818 (2d Cir. 1977), which does not fit neatly with the common fund cases cited above. In Black, nine siblings, some of whom were in foster care, sued the state on a theory that the state could preserve the family unity without increasing the state's overall expenditure by taking the children out of foster care and using those funds to hire a social worker to help the family get on its feet. On its way to dismissing the plaintiffs' statutory claims, the Second Circuit reversed the district court's finding of no jurisdiction. In the court's view, the case was properly aggregated because plaintiffs were seeking to redirect the expenditure of state welfare funds in excess of the jurisdictional amount, and because the siblings' interest in family services was common and undivided. Id. at 817-18. Black v. Beame provides little guidance for our inquiry here due to the wholly dissimilar factual context underlying the case. The plaintiffs' interest in family services was "obviously" common and undivided there, id. at 818, whereas the claims here for reimbursement of discreet overpayments by individuals plaintiffs are separate and distinct. Moreover, Black v. Beame involved federal question jurisdiction which at the time required a $10,000 jurisdictional amount. In Morrison, 228 F.3d at 1270, n.13, we noted that courts were more indulgent in finding federal jurisdiction in that context in order to address significant federal questions.

11

participation does not result in that plaintiff's alleged damages inuring to the benefit of any other party.

To see the difference between the instant case and the cases involving common fund scenarios subject to aggregation, it is useful to consider a hypothetical that simplifies the facts of the instant case and provides, for illustrative purposes only, some figures. Suppose that Friedman's class initially had 50 members and that, if each prevailed on the merits and the court ordered repayment of the disputed premiums, each member would receive the amount that he or she had overpaid in premiums. Suppose further that the overpayment amount is the same for each class member and that the overpayment amount is $2,000. Finally, suppose that 45 class members lose interest in the case and drop out, leaving only 5 members in the class. Each of the remaining 5 members would receive the same $2,000 he or she would have received prior to the departure of the others. Conversely, if the class grew to 200 members, the original 50 would not see their recovery in any way diminished.[4]

Finally, New York Life argues that if the plaintiffs get relief in this case,

---

[4]     Contrast the situation described in our hypothetical with the paradigmatic common fund case, in which multiple plaintiffs assert "claims to a piece of land, a trust fund, an estate, an insurance policy, or lien, or an item of collateral. . ." Gilman, 104 F.3d at 1424. In those cases, one plaintiff's decision to drop his or her claim results in that plaintiff's share being divided up among the remaining claimants. Conversely, the addition of new plaintiffs results in a proportionate reduction of the original claimants' share of the pie.

12

then the entire group will be affected by future premium changes. Specifically,

New York Life claims that there is a common relationship between the class

members and that future premiums will shift between the various class members

and/or between the class members and other insureds as a result of any declaratory

or injunctive relief obtained by Friedman. According to New York Life, cost-

shifting from any one class will increase the premium rates of the remaining

people insured through the group policy.

We have no reason to doubt that, if New York Life loses on the merits of

this case, one possible response might be an attempt to shift some of this cost

amongst its other insureds. However, we are not persuaded that the possibility of

such cost-shifting, which is characteristic of insurance generally, should trigger

aggregation for purposes of calculating the amount in controversy.[5] New York

Life's argument proves too much; if prospective cost-shifting in response to

lawsuits triggered aggregation, aggregation would be the rule, and not the strictly

construed exception. Morrison, 228 F.3d at 1262-63; Eagle Star Ins. Co., 313

---

[5] Such cost-shifting seems to be more in the nature of a possible collateral consequence of an insurance company's losing a lawsuit, rather than anything related to the nature of the right asserted by the plaintiff. See Morrison, 228 F.3d at 1264 ("For amount in controversy purposes, . . . it is the nature of the right asserted . . . that determines whether the claims of multiple plaintiffs may be aggregated").

13

F.2d at 781.[6]

In sum, aggregation is not permissible in this case.


B.  Face Value

New York Life contends that even if aggregation is improper, the case meets

the amount in controversy requirement because "the face value of the policy

controls" and Friedman's  policy has a face value of $2 million.   In support of this

proposition, New York Life cites Guardian Life Insurance Co. v. Muniz, 101 F.3d

93, 94 (11th Cir. 1996) (per curiam); C.E. Carnes & Employers' Liability Assurance

Corp. 101 F.2d 739, 741 (5th Cir. 1939); New York Life Insurance Co. v. Swift, 38

F.2d 175, 176 (5th Cir. 1930).

These cases are easily distinguishable, as each involved a dispute about the

validity of the policy or the scope of coverage for a claim that put the face amount

of the policy at issue.  In both  Guardian, 101 F.3d at 94, and Swift, 38 F.2d at 176,

the insurer alleged that the insured had procured life insurance by fraud and sought

to cancel the policy.

---

[6]        As we note *infra* Part II(C) regarding injunctive relief, this prospective cost-shifting argument is both speculative (because it is just one possible response to a negative ruling on the merits) and describes a consequence that flows not from the right asserted, but rather from New York Life's potential response to a ruling in favor of plaintiffs.  See Morrison, 228 F.3d at 1268 (the amount in controversy is determined from the plaintiff's perspective).

In <u>Carnes</u>, one of the defendants had insured a truck with plaintiff, an insurance company. 101 F.2d 739. The truck was used by this defendant for hauling liquid butane. When the truck blew up, killing and injuring multiple people, the insurer sought a declaratory judgment against all claims to the policy by those who suffered losses in the explosion, on grounds that the policy did not cover use of the truck for hauling liquid butane. The court stated that "[t]he amount in controversy is the value of that which is sought to have declared free from doubt – the policy for $25,000." <u>Id.</u> at 741.

Where, as here, there is no controversy involving the face value of the policy, but only with regards to certain premiums, it would make no sense to consider the policy's face value to be the amount in controversy.


C. <u>Injunctive Relief</u>.

Finally, New York Life argues that the value of any injunctive relief should be added to the value of the compensatory damages. However, New York Life conceded at oral argument that it has not argued that any single plaintiff is seeking relief which would total $75,000, including any and all aspects of such relief. Therefore, New York Life's argument that the $75,000 amount in controversy is satisfied necessarily depends upon its aggregation argument.

We have already determined the nature of the right asserted by Friedman and the other putative class members, namely that they are asserting individual rights that are separate and distinct from the other class members. And we have already determined that the nature of the rights asserted here do not permit aggregation.[7]

In its briefs to the district court and on appeal, New York Life makes a conclusory argument that the injunction sought by Friedman would require future premiums for this group policy to be based upon a completely different rate structure, which, New York Life argues, would mean that the premiums to be paid by all future certificate holders would be affected. New York Life argues that this is sufficient to convert Friedman's claim into one representing a common and undivided interest in a single *res*. We see several flaws in New York Life's argument. First, this argument focuses on Friedman's routine and tag-along prayer for injunction, while ignoring Friedman's primary claim for reimbursement of overpaid premiums. As demonstrated above, Friedman's primary claim for reimbursement clearly asserts an individual right that is separate and distinct from

_____

[7]    See Morrison, in which we held:

Aggregation is determined by the right asserted, not the relief requested .... Accordingly, when an injunction protects rights that are separate and distinct among the plaintiffs, the value of the injunction to the individual plaintiffs may not be aggregated to sustain diversity jurisdiction.

228 F.3d at 1271 (citations omitted).

16

that of other class members.  See Morrison, 228 F.3d at 1266 (rejecting an argument that attorney's fees could be aggregated even though they may partake of a factor suggestive of a common and individual interest, i.e., a punitive nature, and holding that attorney's fees may not be aggregated because plaintiffs had separate and distinct rights to recover attorney's fees, the "paramount issue with respect to ... the aggregation of any claim").

Even if the tag-along prayer for injunction might have more significance than we are inclined to accord it, it is hard to ascertain from New York Life's description that there is in fact a common *res* or that the plaintiffs' claims would properly be deemed to be undivided interests therein.  New York Life suggests that the common *res* might be deemed to be the future premiums to be paid by all the certificate holders in this group policy under a revamped rate structure.  However, it is difficult to say that Friedman and the other putative class members have a common and undivided interest in any such *res* given that each plaintiff has a separate and distinct right and any injunction merely protects that right.  See Morrison, 228 F.3d at 1271 ("[W]hen an injunction protects rights that are separate and distinct . . ., the value of the injunction to the individual plaintiffs may not be aggregated to sustain diversity jurisdiction.").

An additional flaw in New York Life's argument is that it is speculative in at

17

least two ways. New York Life's creative interpretation of the kind of injunction Friedman sought is merely New York Life's own speculation of one possible response it might take. Should plaintiffs prevail on the merits, it is utter speculation as to what course or courses of action New York Life might take with respect to future rate structuring, and Friedman certainly did not specifically seek any particular injunctive remedy. While the description suggested in New York Life's briefs is one possible response, there are undoubtedly several others. For example, New York Life might find ways to cut costs, or even decide to simply cancel the policy. See Lutz, 328 F.Supp.2d at 361 (discussing the speculative nature of injunctive relief in a similar context, noting that the insurance company could simply cancel the policy and terminate the relationship). New York Life's argument is also speculative in that New York Life makes no attempt to quantify the benefit of any particular injunctive relief to Friedman and the other putative class members. See Morrison, 228 F.3d at 1268 (holding that for amount in controversy purposes, the value of injunctive relief is to be measured from the plaintiffs' perspective). The speculative nature of the value of any such benefit to plaintiffs is closely intertwined with the uncertainty regarding the response which New York Life might take to an adverse merits ruling.

Finally, we reject New York Life's approach because, in addition to being

18

speculative, it would create a situation in which the existence of diversity jurisdiction would often be dependant upon which of several possible responses a defendant claimed it would take in response to an adverse ruling.  Whatever its other ramifications, such an approach amounts to an impermissible attempt to measure injunctive relief from the perspective of the defendant.  Id.

### III.  CONCLUSION

For the foregoing reasons, we are persuaded that New York Life has failed to carry its burden of establishing an amount in controversy in excess of $75,000. Accordingly, the district court did not have jurisdiction to hear this case.  We vacate the judgment of the district court and remand this case with instructions for the district court to remand the case to the state court.

**VACATED and REMANDED.**